# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JAMELLE EDWARD ARMSTRONG,
Defendant and Appellant.

S126560

Los Angeles County Superior Court
NA051938-01

February 4, 2019

Justice Corrigan authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin and Kruger concurred.

Justice Liu filed a dissenting opinion in which Justices Cuéllar and Perluss* concurred.

_____

\* Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. ARMSTRONG

S126560

Opinion of the Court by Corrigan, J.

After a jury convicted defendant Jamelle Edward Armstrong of kidnapping, robbing, raping, torturing, and murdering Penny Sigler, it returned a death verdict. On automatic appeal, we affirm Armstrong's convictions but reverse his death sentence because, under the standards of *Witherspoon v. Illinois* (1968) 391 U.S. 510 and *Wainwright v. Witt* (1985) 469 U.S. 412, multiple prospective jurors were improperly excused for cause.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase Trial*

On the night of December 29, 1998, Penny Sigler, a 45-year-old Long Beach woman, was attacked and killed by three strangers: Kevin Pearson, Armstrong, and Armstrong's older half-brother, Warren Hardy. Each of them was tried separately, convicted, and sentenced to death. We have previously resolved the Hardy and Pearson appeals. (See *People v. Hardy* (2018) 5 Cal.5th 56; *People v. Pearson* (2012) 53 Cal.4th 306.)

#### 1. *Prosecution Evidence*

Sigler lived with her husband and Joseph O'Brien in Long Beach. On the evening of December 29, 1998, O'Brien asked Sigler to buy him cereal and milk. She took the food stamps he offered and left on foot between 10:00 p.m. and 10:30 p.m. She never returned.

1

The following morning, a Caltrans worker found Sigler's body on an embankment near the 405 Freeway.  The body was in an area surrounded by a chain link fence and concrete retaining wall.  The body would have been difficult to see from the road.  There were blood spatters and drag marks near the corpse.  Shoe impressions were later identified as similar to the treads on Hardy's and Pearson's shoes.  Police noted a broken wooden stake at the base of a nearby fence and recovered a food stamp book cover matching the serial number of the stamps O'Brien had given Sigler.

Sigler died from asphyxiation and multiple other injuries. Before she died, she suffered 11 broken bones, 20 distinct internal injuries, and 94 separate external injuries.  Her right ear was partially torn.  Lacerations and bruising of the genitalia were consistent with forcible penetration.  A large wooden splinter was embedded in her vaginal tissue.

Pearson, Hardy, and Armstrong were arrested the following week, and Armstrong confessed.  Detective Steven Lasiter related remarks Armstrong made before the taping of his statement began.  The taped confession was played for the jury.

Armstrong told investigators that he, Pearson, and Hardy were drinking with others at the house of a friend, Monte Gmur, on the night of December 29.  Sometime after 10:00 p.m., Pearson, Hardy, and Armstrong left.  After failing to find someone to buy alcohol for them, the three decided to go to the home of Hardy's girlfriend in Los Angeles.  They rode a metro train to its last stop, then proceeded toward a bus stop. Walking under the 405 Freeway, Armstrong called out, "I can't wait 'til '99."  A female voice responded.  The three men approached the

woman, Sigler, who said something like, "I hate you." Hardy offered Sigler money for oral sex. Sigler said no, pushed past Pearson and Hardy, and slapped Armstrong as she went by.

Sigler reached a leafy area near the street, turned, and stuck out the middle fingers of both hands. Using racial slurs, she said, "I hope they kill you all." Pearson ran toward her, saying, "I'm fixing to BKC this bitch." Armstrong explained that "BKC" was a Long Beach term, "bitch killer connect," for someone the speaker did not like who might get beaten up. Pearson punched Sigler and knocked her down. Armstrong and Hardy walked toward them. Armstrong heard Pearson say, "Give me your money." Pearson went through Sigler's pockets, found food stamps, then started to remove her pants. When she struggled, he asked Hardy and Armstrong to hold her arms and legs. They did so. Pearson removed Sigler's pants and asked where her money was. He tore open her shirt and underwear, then unzipped his pants and asked for a condom. Hardy stood off to the side. Armstrong was still holding Sigler's arms and said it appeared Pearson was engaging in intercourse.

After he finished, Pearson said, "This ain't over yet bitch. Let's kill this bitch." He kicked and stomped her in the chest and face. Armstrong also kicked her several times. She made gurgling, moaning noises. Armstrong recognized Sigler was in considerable pain.

Pearson asked what to do with Sigler, then told Armstrong to jump over a chain link fence and hold it down so they could move her behind it. When Pearson and Hardy hoisted Sigler over the fence, she landed head first in a concrete ditch. Pearson dragged her 20 feet to a dark spot. He tripped over and broke off a three-foot long wooden stake. Using the stake, he hit Sigler

five to 15 times with a two-handed grip, swinging as hard as he could. Sigler blinked and moaned in response to the blows. Pearson then inserted the stake in Sigler's vagina, pulling it in and out. Hardy took the stake and did the same. When Sigler finally made no more noise, Armstrong held a lighter to her face and saw her eyes close.

Pearson and Armstrong moved the body further up the embankment toward the freeway. Armstrong threw away the stake and a trash bag filled with Sigler's clothes. The three men caught a bus and spent the night at the residence of Hardy's girlfriend.

Blood on a pair of Armstrong's overalls matched Sigler's DNA. A stain on his shirt contained his own semen and blood from an indeterminate source.

Armstrong's girlfriend, Jeanette Carter, testified that a week after the murder Armstrong told her he had done something very bad. He said Pearson had beaten and raped a woman and put a stick in her vagina while Armstrong held her down. A tape of an earlier police interview of Carter was also played during which she related similar admissions by Armstrong.

Keith Kendrick, a friend of Pearson's and Armstrong's, testified he was with them when they saw a news report of the murder. Kendrick, to whom Pearson had already confessed, said, "I know who did that. [¶] . . . [¶] Killer Kev did it." Armstrong whispered to Pearson, "How did he know?" and then sat silently as Pearson recounted the details.

2. *Defense Evidence*

Armstrong was the sole defense witness. He conceded he had been with Pearson and Hardy during the crimes but minimized his role.

The three men were out walking the night of December 29, 1998. Armstrong was in a good mood and yelled out, "We are going to have a Happy New Year for '99." He then heard Sigler yell from across the street, "Fuck you niggers." Hardy walked across the street toward Sigler. Pearson and Armstrong followed. Sigler and the three men were the only ones on the street. Armstrong thought Sigler was on drugs.

Hardy offered Sigler $50 to perform fellatio on all three men, but Armstrong knew he was joking because Hardy did not have that much money. Sigler ran past him, turned, displayed the middle fingers of each hand, and said, "Fuck you niggers. You niggers should die." Pearson ran up to Sigler and struck her in the face. Armstrong held her down because Pearson demanded he do so. He saw Pearson go through her clothes, but Armstrong did not intend to steal from her. He saw Pearson take food stamps from Sigler's pocket and place them in his own. When Pearson stopped going through Sigler's clothes, Armstrong let her go.

When Pearson renewed the assault, kicking and stomping Sigler, Armstrong said they should leave. He did not leave by himself because he had no money for bus fare. Armstrong held Sigler down again at Pearson's direction. Armstrong never kicked Sigler himself, but at one point while restraining her he had his foot on her chest and pushed her with his foot. Armstrong did not try to stop Pearson because he feared Pearson would turn on him. When Pearson raped Sigler,

Armstrong was standing behind him, not holding Sigler down. Pearson and Hardy threw Sigler over the chain link fence. Armstrong thought the attack was scandalous and animal-like, but helped Pearson move Sigler up the embankment. He threw away both the stake and Sigler's clothes because Pearson told him to, and because he was afraid of Pearson. The encounter lasted around 30 minutes.

### 3. *Charges and Guilt Phase Verdict*

Pearson, Hardy, and Armstrong were tried separately. (See *People v. Pearson*, *supra*, 53 Cal.4th 306; *People v. Hardy*, *supra*, 5 Cal.5th 56.)

Armstrong was charged with various counts of murder, kidnapping, robbery, rape, and torture, with six attendant special circumstances.[1] Armstrong was also charged with kidnapping and torture as sentence enhancements. (§ 667.61, subds. (a), (d).) The jury convicted Armstrong on every count and found every special allegation true, except for the special circumstance that Armstrong committed murder during a kidnapping.

---

[1] The charged offenses included first degree murder, second degree robbery, kidnapping for purposes of rape, rape, rape while acting in concert, sexual penetration with a foreign object, sexual penetration with a foreign object while acting in concert, and torture. (Pen. Code, §§ 187, subd. (a), 189, 206, 209, subd. (b)(1), 211, 261, subd. (a)(2), 264.1, subd. (a), 289, subd. (a)(1)(A).) The special circumstances included robbery, kidnapping, kidnapping for purposes of rape, rape, rape by instrument, and torture murder. (§ 190.2, subd. (a)(17)(A), (B), (C), (K), (a)(18).) All further unlabeled statutory references are to the Penal Code.

B. *Penalty Phase Trial*

1. *Prosecution Evidence*

Monte Gmur testified that on the evening of the murder, Pearson asked him if Pearson, Hardy, and Armstrong could use a bedroom to initiate a man named Chris into their gang. Gmur refused because he did not want a violent initiation ritual in his house. The three men left for 15 to 20 minutes. When they returned, Hardy borrowed Gmur's phone to call a man named Capone and tell him Chris was "cool" and would be called "Playboy."

Janisha Williams, a childhood friend of Armstrong's, testified he was a member of the Capone Thug Soldiers gang. The gang required "jumping in," i.e., fighting a gang member to join. On occasion Williams had seen Armstrong kick people, hit them with sticks, or stomp on them during fights.

Sheriff's Deputy Hugo Baraja testified that Armstrong and three other African-American prisoners attacked a Hispanic inmate.

Sigler's son testified he was unable to finish high school after the murder because of the pain of her loss.

2. *Defense Evidence*

Detective Steven Lasiter testified that during his police interview Armstrong appeared to feel badly about what he had done.

Reverend Larry Clark testified that he knew Armstrong and his family, although he had not seen them since the defendant was 14 or 15. The Armstrong family lived in a high-crime neighborhood and had financial problems. Armstrong's father, James, was sometimes absent. Armstrong had potential

as an artist and would sometimes help with church cleanup or charity work.

James Armstrong admitted he had been a poor parent. He earned a living selling drugs and pimping, was frequently absent, and never taught Jamelle right from wrong. He supplied Jamelle with drugs and alcohol. Jamelle's mother, Pamela, was an alcoholic who drank and used drugs. James beat his wife in their son's presence.

### 3. *Rebuttal Evidence*

The People called Jamelle's mother, Pamela, who described a different family dynamic. Various police officers testified to Jamelle's gang membership.

### 4. *Penalty Phase Verdict and Sentence*

The jury returned a death verdict, which the court imposed. It added consecutive terms of 30 years, 25 years to life, and life with the possibility of parole.[2]

---

[2] The abstract of judgment indicates, incorrectly, that Armstrong's conviction on four counts was pursuant to a plea rather than a jury verdict. The abstract of judgment also incorrectly indicates Armstrong received nine years on the rape count, not eight, and incorrectly lists a determinate term of 56 years, not 30 years. Finally, the abstract of judgment fails to indicate that in addition to the determinate term for rape in concert, sexual penetration with a foreign object, and sexual penetration with a foreign object while acting in concert, Armstrong received a 25-year-to-life term under section 667.61, subdivisions (a) and (d), which was then stayed under section 667.61, subdivision (g). The People ask, without opposition, that we order the abstract of judgment corrected. We will do so. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## II. DISCUSSION

### A. *Juror Selection Issues*

#### 1. *Excusal of Prospective Jurors for Cause*

Prospective jurors initially completed a questionnaire. The court then conducted *Hovey* voir dire, during which potential jurors were asked outside the presence of others about their death penalty views. (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80–81.) Armstrong contends the court erred by excusing multiple jury candidates on the ground they could not fairly and impartially consider whether death was the appropriate punishment. We agree. During our discussion, we refer to both written and oral responses.

#### a. *Legal Principles*

"[T]he Sixth Amendment's guarantee of an impartial jury confers on capital defendants the right to a jury not 'uncommonly willing to condemn a man to die.' " (*White v. Wheeler* (2015) 577 U.S. ___, ___ [136 S.Ct. 456, 460], quoting *Witherspoon v. Illinois*, *supra*, 391 U.S. at p. 521.) To accommodate this right, " '[p]ast decisions of the United States Supreme Court and this court establish that "[a] prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright v. Witt*[, *supra*,] 469 U.S. [at p.] 424; *People v. Crittenden* (1994) 9 Cal.4th 83, 121; *People v. Mincey* (1992) 2 Cal.4th 408, 456.) ' " 'A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where

appropriate.' " ' " ' " (*People v. Pearson*, *supra*, 53 Cal.4th at p. 327.) The party seeking excusal bears the burden of developing evidence for dismissal. (*Wainwright*, at p. 423; *People v. Stewart* (2004) 33 Cal.4th 425, 445.)

A person's particular views on the death penalty, the strength with which those views are held, and their effect, if any, on the person's ability to perform a juror's duties are often nuanced questions. " '[N]ot all who oppose the death penalty are subject to removal . . . ; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' (*Lockhart v. McCree* (1986) 476 U.S. 162, 176.) 'The critical issue is whether a life-leaning prospective juror — that is, one generally (but not invariably) favoring life in prison instead of the death penalty as an appropriate punishment — can set aside his or her personal views about capital punishment and follow the law as the trial judge instructs.' " (*People v. Jones* (2017) 3 Cal.5th 583, 614.) Jurors are not required to like the law, but they are required to follow it. A jury candidate who will not, or cannot, follow a statutory framework, is not qualified to serve. Yet so long as prospective jurors can obey the court's instructions and determine whether death is appropriate based on a sincere consideration of aggravating and mitigating circumstances, they are not ineligible to serve. (*People v. Stewart, supra*, 33 Cal.4th at p. 447; *People v. Lewis* (2001) 25 Cal.4th 610, 633.)

Whether a candidate is substantially impaired is an issue for the trial court's determination, and its ruling is entitled to deference. (*People v. Souza* (2012) 54 Cal.4th 90, 122.) Impairment need not be proven with " 'unmistakable clarity.' "

(*Wainwright v. Witt, supra*, 469 U.S. at p. 424.)  Excusal is permitted when the trial judge has been "left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Id.* at p. 426; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1066.)  We review the ruling for abuse of discretion. (*People v. Scott* (2015) 61 Cal.4th 363, 378; *People v. Jones* (2012) 54 Cal.4th 1, 41.)

Here, the court improperly excused at least four candidates.  In doing so, it committed two kinds of errors: (1) it applied an erroneous standard to the question of qualification; and (2) it relied on factual bases not supported by the record.  As a result, the death verdict must be reversed. (*People v. Heard* (2003) 31 Cal.4th 946, 966.)

### b.  Prospective Juror S.R.

S.R. wrote in his questionnaire that he supported the death penalty and believed it was "a big deterrent to many others who may wish to kill."  The death penalty should not be mandatory, but should be available in "special circumstances."  S.R. saw death as an appropriate punishment "if the crime was horrendous enough," as in cases of "mutilations [or] torture."  He could vote for either life or death, but would not automatically vote for either.  He considered his "duty as a juror to be fair and un-biased."  He was willing to serve because he was "a fair person.  I have always been one to listen to both sides of an argument.  I also know people [who] have done good things, and people who have done bad things.  A defendant/prosecution deserves jurors that are not one-sided and biased."

During voir dire, S.R. confirmed he could vote for either death or life, and would choose neither automatically.  He could keep an open mind, and would consider whatever factors the

court instructed were relevant. S.R. could vote for death if the aggravating circumstances substantially outweighed those in mitigation, and for life if they were equal. S.R. saw death as a "far worse" punishment than life in prison without possibility of parole, and would reserve it for "a truly horrible crime." Nevertheless, "if it does fit the crime," S.R. could choose death.

The prosecutor focused S.R.'s questioning on three hypotheticals involving a liquor store robbery, a beating death, and a bank robbery. In the liquor store hypothetical, a defendant walking by noticed the cash register was open, entered the store on the spur of the moment, killed the cashier, and stole the money. S.R. was unsure which penalty he would select without having more facts, which the prosecutor declined to supply. Based only on the information provided, S.R. said he would probably not vote for death. Asked to assume that unspecified aggravating circumstances substantially outweighed any mitigating circumstances, S.R. said he could vote for death. The prosecutor stressed S.R. would be instructed that life remained an option even if the aggravating circumstances outweighed the mitigating circumstances and asked again if S.R. could choose death. S.R. replied, "I'm sure I probably could," but voting for life or death was "not something I would take lightly."

In the deadly beating hypothetical, one person held a victim's arms while a second person inflicted the beating. S.R. thought the one restraining the victim to be nearly as guilty as the beater, but not equally so. If the aggravating circumstances substantially outweighed any in mitigation, S.R. affirmed he could vote for death for the restraining participant. The prosecutor challenged the plausibility of this answer in light of S.R.'s belief that the restrainer was slightly less culpable and

the court's instruction that death was not mandatory even if the aggravating circumstances were substantially greater. S.R. replied: "[Y]ou asked if I could [vote for death], if it was possible, if [the aggravating circumstances were more than the mitigating circumstances]. I could. I'm not saying I would, you know, you're [asking] could I?" The prosecutor challenged his answer: "If you don't think that the two people are equally guilty, wouldn't you give them different punishments, because they weren't equally guilty?"[3] To explain why he could vote for death, S.R. relied on the additional factor supplied by the prosecutor, that the aggravating circumstances outweighed the mitigating circumstances. The prosecutor asked a third time: "So in your mind, because the person holding the arms is not as guilty as the person actually doing the punching, wouldn't you impose life without the possibility of parole on him and give the other guy, the one actually doing the punching, the death penalty?" S.R. adhered to his answer: "I could do both in that [circumstance]. Like I said, you asked, could I do either [life or death]?"

The prosecutor then turned to a scenario involving three bank robbers: a getaway driver, a lookout, and the actual killer who went inside and shot someone. Asked whether he would consider the getaway driver equally or less culpable than the

---

[3]     It appears the court and prosecutor used the term "guilty" with some imprecision. As a matter of law, an aider and abettor can be as "guilty" of an offense as a direct perpetrator, in the sense that both may be convicted of the same crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117.) The term as used here seemed to involve not legal guilt but respective degrees of blameworthiness or culpability as that concept relates to sentencing.

actual killer, S.R. asked whether the driver knew the shooter was going to kill someone. When told the driver did not, S.R. concluded the driver was less culpable and he would probably not impose death. Likewise with the lookout: If neither aider and abettor knew a shooting was intended, S.R. would reserve death for the actual killer.

The prosecutor moved to excuse S.R. During argument over the motion, defense counsel reasserted a continuing objection to the prosecutor's questioning using aiding and abetting hypotheticals without any instruction on when, as a matter of law, a person who was not the actual killer could be eligible for death. The prosecutor argued against instruction: "If a juror knew the law, the juror would then frame his [answer] in accordance with the law. A true test of the juror's state of mind with regard to aiding and abetting, and accomplices, is to find that out without pre-instructing them, because then we know what their true views are. If they know what the law is, in advance, we cannot find out what their true views are, *because they want to follow the law*." (Italics added.)

The court embraced the prosecutor's position against pre-instruction because it would color the jurors' responses. It reasoned that those who wished to follow the law would shape their answers to conform with legal requirements, and asking uninstructed jurors would give better insight into their true feelings: "By not giving the [aiding and abetting] instruction, . . . wouldn't that be a better way to test their mind, a true test of their mind, as to whether or not they would be able to impose the penalty of death, whether they could on an aider and abettor?" The court further explained: "[N]ormal people . . . understand that [there] should be different liabilities for an aider and abettor [than] for the perpetrator. [¶] And given that

is the case, if that is, in fact, the true state of mind of a particular prospective juror, that is a worthy test of whether or not, given that they see a difference in liability in their state of mind, would that create a variance as to their ability to be able to impose punishment? Because that, effectively, would be a fair way to determine whether the person would automatically, in fact, not impose the penalty of death and would automatically impose life without parole, because of their varying views on the liability of an accomplice.[4]  [¶]  And that's the reason why this

---

[4]    In referring to what a candidate would "automatically" do, the court overlooked how the United States Supreme Court's thinking on disqualification had developed, an evolution that has shifted the focus to subtler considerations:  "In *Wainwright v. Witt*[, *supra*,] 469 U.S. 412 . . . , the United States Supreme Court reconsidered language in *Witherspoon v. Illinois*[, *supra*,] 391 U.S. 510 . . . , to the effect that prospective jurors may be excused for cause if they make it 'unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*' (*Id.* at p. 522, fn. 21.)  This standard had tended to be applied in formulaic terms, with 'lower courts stat[ing] that a veniremember may be excluded only if he or she would "automatically" vote against the death penalty, and even then this state of mind must be "unambiguous," or "unmistakably clear." [Citation.]' (*Witt,* at p. 419.)  [¶] In *Witt,* the high court rejected such a narrow and formalistic approach and discarded the *Witherspoon* formulation.  It held instead that a trial court may excuse a prospective juror for cause whenever 'the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Witt, supra,* 469 U.S. at p. 424, fn. omitted.)" (*People v. Heard, supra,* 31 Cal.4th at p. 983 (conc. & dis. opn. of Brown, J.).)

court is not going to give a pre-instruction on aiding and abetting. I believe that that is a fair way to test the true state of mind of lay people, because that's exactly what we are trying to do. [¶] We don't want to pre-instruct them just so that they can fit their answer with the law."

The court excused S.R. for cause, concluding his fitness to serve should be determined by his uninstructed views on the relative culpabilities of hypothetical aiders and abettors: "[I]n terms of an accomplice, or an aider or abettor, it is [S.R.'s] true state of mind that they're not equally guilty, and even if they are guilty, they're not equally guilty. In other words, in these folks' eyes, the person is guilty, but there's a degree of guilt. And that is really the true test of whether or not they would be able to consider the penalty of death or automatically vote for life without parole."

We note several things here. First, the prosecutor's argument and the court's ruling appear to presume that jury candidates would violate their oath and commit misconduct by shading their answers to secure a place on the jury. They also misapprehend the appropriate test for qualification, which turns on a willingness and ability to follow the law. It seems counterintuitive to conclude that the "true test" of this ability involves keeping candidates in the dark as to the law's requirements. Advocates may certainly inquire about a candidate's broader death penalty views and take them into account when exercising *peremptory* challenges. But those broader views, even if leaning significantly toward one side or the other, will not support a challenge for *cause* unless they would substantially impair the ability to serve.

Second, the death penalty statutes reflect, as a matter of policy and constitutional mandate, that a decision as to capital punishment is to be made on an individualized basis. (*Woodson v. North Carolina* (1976) 428 U.S. 280, 304.) Jurors are to consider the nature of the crime, the circumstances of its commission, and a variety of factors relating to the particular defendant. These latter factors may include his past criminal conduct and a variety of developmental and historical experiences. This weighing can result in different degrees of blameworthiness being assigned from case to case and among co-participants. A juror willing to act in conformance with statutory mandates, able to openly and honestly consider both sentencing alternatives, may well identify different levels of culpability for different participants in the same events. That a juror can do so is not grounds for disqualification.

In determining otherwise, the court applied a test for ineligibility that was erroneous as a matter of law. Under *Witherspoon* and *Witt*, the state is permitted to cull from the jury pool only those who would be unable to set aside their personal views and follow the law and the court's instructions. (*Lockhart v. McCree, supra,* 476 U.S. at p. 176; *People v. Jones, supra,* 3 Cal.5th at p. 614; *People v. Stewart, supra,* 33 Cal.4th at pp. 446–447.) An unimpaired juror who perceives differences in culpability might well be open to a variety of determinations: (1) though an aider and abettor was comparatively less blameworthy, the crime was sufficiently egregious, and his participation and knowledge sufficient, that both he and the actual killer merit death; (2) only the actual killer merits death; or (3) neither defendant does. That S.R. ascribed different degrees of culpability to some aiders and abettors in some hypotheticals offered no basis for determining he would be

unable to follow the court's instructions and choose between a life or death sentence in accordance with the law. Indeed, his answers indicated the contrary.[5] By framing the test of eligibility to serve as it did, the court risked excluding jurors who could follow the court's instructions and appropriately use evidence in aggravation and mitigation to differentiate between those who merited the death penalty and those who did not.

Third, when assessing a candidate's ability to serve, fact-based hypotheticals should be used with caution. " '[T]he *Witherspoon-Witt* . . . voir dire seeks to determine only the views of the prospective jurors about capital punishment in the abstract. . . . The inquiry is directed to whether, without knowing the specifics of the case, the juror has an "open mind" on the penalty determination.' " (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1120, quoting *People v. Clark* (1990) 50 Cal.3d 583, 597.) Hypotheticals that too closely mirror the expected facts of the case at hand may result in jurors prejudging a case on a brief summary of the evidence. (*Zambrano*, at p. 1120; *People v. Pinholster* (1992) 1 Cal.4th 865, 915.) Further, questions focusing only on specific factual circumstances can yield answers that might be used to erroneously cull competent jurors. The way a question is posed may skew the answer. For example, a hypothetical that emphasizes aggravating factors might elicit an answer that leans heavily in favor of execution.

---

[5] When asked whether he could comply with the court's instructions, even if he did not agree with them, S.R. checked "yes" and wrote: "It's the court's instructions, we must follow them." He affirmed that he could "consider all of the relevant factors that the court will give you." He explained that his ability to vote for death would depend in part on "what the judge says" about the law.

(See *People v. Mason* (1991) 52 Cal.3d 909, 940.) Trial courts may prohibit such hypotheticals. (*People v. Sanders* (1995) 11 Cal.4th 475, 538–539.)

This case presents an obverse situation, with hypotheticals describing defendants at, or beyond, the outer reaches of death eligibility. The United States Constitution and California's sentencing scheme make lookouts, getaway drivers, and others involved in, but absent from, a robbery or homicide scene categorically ineligible for death without additional showings as to the degree of their participation and the extent of their awareness or intent that a fatality might result. (§ 190.2, subd. (d); *Enmund v. Florida* (1982) 458 U.S. 782, 795–798; *People v. Banks* (2015) 61 Cal.4th 788, 798–804.) As for the prosecutor's beating hypothetical, assault alone is not a basis for special circumstance felony murder. (See § 190.2, subd. (a)(17).) By definition, a competent juror who can consider both life and death as options would be willing to vote for death in some cases and for life in others. Given sufficiently mild hypothetical scenarios, many competent jurors might say they would be quite likely to vote for life without the possibility of parole. Such responses do not necessarily reveal that the same juror would not vote for death under more aggravating circumstances. (See *People v. Mason, supra,* 52 Cal.3d at p. 940.)

Here, the prosecutor supplied no additional facts that would make the hypothetical robbery and beating aider and abettors legally eligible for death or clearly deserving of that punishment. Instead, S.R. was required to assume an unspecified special circumstance had been proven and unspecified aggravating circumstances were present. Even so, S.R., a death penalty supporter, consistently maintained that he could vote for death under the appropriate circumstances, both

in general and as applied to an aider and abettor. S.R.'s answers give no indication he was unfit to serve.

The court also relied on S.R. being unable to consider death as an option for some charged special circumstances. It asserted that S.R. "picks and chooses the special circumstances that he believes he would be able to consider the penalty of death on." The record does not support this assertion. S.R. never indicated he could not consider death as an option for the charged special circumstances. He simply expressed uncertainty as to how he would vote if each of several of the charged special circumstances was the only one found true. A juror who indicates he could vote for death, but is unwilling to guarantee he would do so, is not subject to excusal for cause. (*People v. Pearson, supra*, 53 Cal.4th at p. 332.)

A court can abuse its discretion by applying an erroneous legal standard or by making a ruling unsupported by substantial evidence. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712.) Both problems are present here. The court's remarks, and a comparison of its ruling with the record, reflect that it was overlooking the crucial question of whether S.R. could set aside his personal views and follow the court's instructions. Instead, the court concluded S.R.'s views might lead him to vote against death under particular unrelated facts. Standing alone, views of that nature do not support a challenge for cause. Additionally, the record reveals no substantial evidence that S.R. would have had any difficulty following the court's instructions in determining the appropriate sentence.

The erroneous exclusion of S.R. was not an isolated occurrence. The record reflects that the court applied the same "true test" to other candidates, focusing on whether they would

be equally willing to impose death on an aider and abettor as on an actual killer, rather than on whether they could follow the law and consider death as an option. Application of this test excluded several essentially neutral candidates who professed their ability to follow the court's instructions and impose death in an appropriate case.

We discuss the others in turn.

### c. *Prospective Juror M.M.*

In her questionnaire, M.M. agreed that California should have a death penalty and should not abolish it because "it serves as a deterrent for some offenders." Death would be an appropriate punishment for "repeat murderers," among others, and serves to "provide justice in the cases that warrant it." M.M. repeatedly stated she could vote for death, but would not automatically do so. Whether death was appropriate should be decided "on a case-by-case" basis. M.M. had no religious or moral views that would make it difficult for her to vote for execution.

In voir dire, M.M. said that she was neutral as to sentence and could vote for either. On six occasions, she affirmed her ability to vote for death. When asked whether she could look at the defendant and say, "I kill you," M.M. replied: "I think that's a very hard position to be put in, but I think the approach I would take is that I need to do the right thing, either not guilty or guilty and where ever that falls, given the information, then I would have to feel comfortable with that."

Given that M.M. was neither for nor against the death penalty, the prosecutor asked how she could determine whether M.M. would vote for death. M.M. said her decision would depend on the evidence, not prior leanings: "I don't know that

you can determine that [I would vote for death] at this point. I think that determination or decision would be made after the information was given to me or any other juror. [¶] At this point, I don't have a say one way or the other, because I haven't heard anything." She went on: "I certainly would want to do the right thing by the defendant or by the other side. [¶] I would want to do whatever the evidence or the information warranted. . . . [¶] It would be a very difficult decision if I had to decide that it was a death penalty. I don't think anybody would walk away feeling great about doing that, but I feel I have to do what was warranted by the case." When asked again how she could "impose the death penalty if you don't even know what your feelings are regarding it?," M.M. said, "I really don't have a set decision like some people [where] I'm all for the death penalty or totally opposed. [¶ Q.] You don't have a feeling one way or the other. [¶ A.] I don't have a feeling one way or the other. I'm neutral. My feeling would be each case would be individual and unique in itself, and I think you need to go into [it] looking at it like [that]. . . . Every case is different and unique."

M.M. affirmed that she could vote for death if the aggravating circumstances outweighed the mitigating circumstances and could impose death on an aider and abettor such as a defendant who held a victim's arms while a second defendant beat the victim to death. She repeated that she could tell the defendant he was going to die.

The prosecutor then turned to the bank robbery hypothetical with a getaway driver, a lookout, and the actual killer. M.M. described the nonkillers as less culpable, but when asked if she could impose death on the getaway driver if the aggravating circumstances outweighed the mitigating circumstances, she said she could. The prosecutor suggested

those answers were inconsistent: "How can you impose the death penalty on the person who is waiting out in the car, when you believe he is not as guilty as the person who pulled the trigger?" M.M. explained, "Because you said that . . . the bad issues about him were more than the ones that weren't bad." The prosecutor explained that under the law, a juror could, but did not have to, impose death when aggravating circumstances outweighed mitigating ones. She then asked, "[K]nowing that, *would* you impose the death penalty on the person waiting in the car?" (Italics added.) This time, M.M. said, "No."

The prosecutor challenged M.M. on the ground that M.M. did not know whether she was for or against the death penalty and would be unable to impose death on an aider and abettor. The court granted the motion on the basis that M.M. would not impose the death penalty in the getaway driver scenario, and the People defend the excusal on that basis alone.

The record offers no support for the prosecutor's assertions. M.M. consistently indicated, in her questionnaire and in response to questions from the bench, defense attorney, and prosecutor, that she could impose the death penalty in an appropriate case based on the evidence submitted. She believed California should have the death penalty and that it serves as a deterrent. Being "neutral" on the death penalty before hearing any evidence is not disqualifying. (*People v. Pearson, supra,* 53 Cal.4th at p. 332.) Indeed, M.M.'s answers show she was unwilling to prejudge the matter. She confirmed that she could impose the death penalty on a nonkilling aider and abettor, in both the beating and bank robbery hypotheticals.

M.M. did indicate that, given the option, she would not choose death for the getaway driver. That answer did not

23

demonstrate substantial impairment or views that would prevent her from serving. Recognizing different degrees of culpability, M.M. acknowledged that hypothetically she could, but would choose not to, impose death on a less culpable defendant. This response does not indicate an inability to follow the court's instructions. Her answers reflect an ability to listen to and follow the law. She properly declined to guarantee how she would vote based on the facts proven at trial. Her excusal was error.

### d. Prospective Juror L.B.

Prospective juror L.B. described himself as "for" the death penalty and thought it was used too seldom. He approved of California having the penalty because "[i]f [a] very violent crime is committed, [the] death penalty is justified." Death was appropriate for "premeditated, and brutal" crimes; life in prison without possibility of parole gave him pause because he was "afraid that the law can be changed" so that the defendant could get out on parole. L.B. held no religious or moral objections to the death penalty and could vote for it. Death should not be automatic for intentional murders, but should "depend[] on [the] person's state of mind before and during committing the act." To L.B., a death sentence meant "that society will be somewhat safer."

Under questioning from the court and counsel, L.B. indicated that before hearing the evidence, he was not leaning toward life or death, would keep an open mind, could follow the court's instructions, and could vote for either sentence. He indicated he could vote for death in the case of someone who, seeing a cash register open, opportunistically killed the cashier to steal the contents.

As she had with other jurors, the prosecutor asked L.B. hypothetically about the three participants in a bank robbery and the two participants in a beating death. In the bank robbery scenario, L.B. agreed the getaway driver, lookout, and actual killer were equally responsible. He could impose death on the getaway driver or lookout, depending on the balance of aggravating and mitigating factors, provided the person knew the actual killer was armed. In the beating hypothetical, L.B. considered the person holding the victim down equally culpable. He hesitated to say that he could impose death on him, however, because he "still assume[d] that the guy who is holding him didn't probably know that he is going to be severely beaten." Asked to reconcile that hesitation with his willingness to impose death in the armed robbery scenario, L.B. explained: "[W]hen you start beating on somebody, I don't think . . . you [are] doing it with the intention that you are killing, but when you have [a] weapon then it's a different story. You have a weapon for one reason[,] to hurt somebody, in my opinion." Based on that distinction, he did not feel the person holding another's arms should be executed if the beating victim ultimately died.

The prosecutor challenged L.B. for cause on the sole basis that he could not apply the law with regard to aiding and abetting. The court granted the motion on that basis, and the People defend the excusal on the same ground.

The excusal of L.B. was flawed for the same reasons discussed in connection with S.R. and M.M. L.B. consistently indicated that he could follow the law and the court's instructions and could impose death in a number of factual situations. That the prosecutor could construct a murder hypothetical for which L.B. thought one perpetrator should be spared execution does not mean he was substantially impaired

within the meaning of *Witt*. The prosecutor offered no additional facts that might actually support a special circumstance finding, nor sufficient aggravating factors to justify a vote for death. Many competent jurors might react to such a hypothetical by indicating they would vote for life, not death.

No other evidence supports the court's ruling. The record shows L.B. actively supported the death penalty, thought it was used too infrequently, and would be able to consider either life or death in a range of circumstances. Even the prosecutor described L.B. as "good up until the last hypothetical." The excusal of L.B. was error.

### e. *Prospective Juror G.P.*

Prospective juror G.P. had a slight proprosecution leaning, but said he would try to avoid any prejudice and could follow the court's instructions. He felt the death penalty "is an appropriate punishment in certain cases" and favored California having the penalty because "in some cases it is called for," such as cases involving "plan[ned], premeditated" murder. In addition to supporting the death penalty, G.P. could vote for it, though he would not automatically do so. Neither death nor life should be mandatory in all murder cases; instead punishment should "depend[] on the circumstances." G.P. had no philosophical or religious convictions that would affect his ability to impose death, but sitting on a capital jury would be difficult because "[i]t is a very serious thing to have someone's life in my hands." Still, G.P. could vote for death "[i]f the facts meet the criteria," such as when a defendant had "without any thought taken another's life to gain money [or] property, or hunted down another to kill them." Both death and life without possibility of

parole were severe sentences to G.P. He stated in one part of his questionnaire that life without parole was worse, but reported in another that he was "torn" as to which was worse.

When asked by the court whether, based on personal views, he would refuse to vote for the death penalty without considering aggravating and mitigating factors, G.P. replied, "No, I don't think so." G.P. would not begin by immediately favoring life or death; rather, "either defense or prosecution would [have to] convince me that [the case] called for the death penalty, I'd have to listen to the different circumstances. And hopefully keep an open mind . . . ."

When asked by the prosecutor how he could impose death even though he was not sure it was a more severe sentence than life in prison, G.P. explained: "I go back to what takes place during the trial, during the penalty phase. I would listen to all the evidence . . . [¶] [I]f the circumstances surrounding the crime and all the factors leading up to it called for the death penalty, then I think[] I could do that too." The prosecutor asked again, "[H]ow will we know you are able to impose the appropriate punishment?" G.P. replied, "Well, I don't know how you would know. I really don't. Again, you have to take my word that I would listen to all the evidence and make the decision that I think is right. And since you are the prosecution side, you would have to convince me — not maybe convince me like I'm resisting it, but show me that this man deserves the death penalty in this case." Pressed on what the prosecutor would have to show him to get a death verdict, G.P. would not agree that any single factor would be necessary or sufficient: "[U]ntil I hear the evidence, I don't know [what you would have to show me]." The prosecutor then went through each special circumstance one by one and asked whether, if she proved only

first degree murder and that one special circumstance, G.P. could vote for death. G.P. replied in each case some variation of "probably" or "I'm not sure, I think I could," but "might be reluctant" if the only special circumstance was murder in the course of a kidnapping.

G.P. had written on his questionnaire that he thought life without possibility of parole might serve as a replacement for the death penalty. He explained that "a lot of so-called industrial countries feel that life [in prison] is good enough punishment for somebody," but he still believed in execution when "the circumstances surrounding the crime call for the death penalty." When asked for circumstances that might call for death, he offered, "[M]aybe in [a] case like this case, possibly, . . . the way the charges were read with torture and things like that[,] rape with using the foreign object, the cruelty of this crime, possibly, assuming that this all took place, and the defendant committed these crimes, then it could call for the death penalty."

After G.P. agreed he wasn't sure how he felt about the death penalty, the prosecutor asked, "And since you don't know how you feel about the death penalty, how am I able to determine whether or not you could impose the death penalty, if the circumstances warrant it?" G.P. replied, "If the circumstances warrant it, I would be able to impose it." The prosecutor described G.P.'s frame of mind as being "torn between life without the possibility of parole and between the death penalty"; G.P. disagreed, saying, "No, I think my frame of mind [is], I'm willing to listen to all the circumstances from both sides and make up my mind then about whether to impose the death penalty on someone or life in prison." If the aggravating circumstances outweighed any mitigating circumstances, G.P.

could impose death. When asked to consider the beating hypothetical and assume the aggravating circumstances substantially outweighed the mitigating, G.P. affirmed that he had "[n]o doubt" he could impose death on the aider and abettor.

G.P. acknowledged that, as he had written in his questionnaire, he did not think the death penalty was an effective deterrent. He rejected the prosecutor's suggestion that he therefore would be incapable of imposing death: "Well, I don't think that just because my idea is that [the] death penalty is not a deterrent doesn't keep me from imposing the death penalty [¶] . . . [¶] [I]f the circumstances surrounding the crime call for the death penalty, then I can make that decision."

The prosecutor turned to the bank robbery hypothetical. G.P. thought all three "equally guilty of murder," but "probably wouldn't impose the death penalty" on the getaway driver who, as the prosecutor described it, "didn't go inside[,] he didn't shoot[,] he wasn't the actual killer."

The prosecutor moved to excuse G.P. for cause, and the court granted the challenge. The court highlighted two aspects of G.P.'s views it was troubled by: G.P.'s belief that life in prison without possibility of parole might substitute for the death penalty, given that other industrial countries got by without capital punishment, and his belief that the death penalty was not a deterrent. The first view the court saw as a way many "smart" prospective jurors discussed the death penalty, discussions the court characterized as "some kind of intellectual sophistry." The second view, that the death penalty was not a deterrent, the court saw as a basis for "infer[ring] that he could not impose [the death penalty, and] that's the inference that has to be drawn based on the state of mind."

The inference that, simply because one has doubts about the efficacy of the death penalty, one would refuse ever to impose it and may be excused for cause has long been forbidden. That a prospective juror may "voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction" is an insufficient basis for excusal. (*Witherspoon v. Illinois*, *supra*, 391 U.S. at p. 522.) The high court has clarified that the prosecution "must demonstrate, through questioning, that the potential juror lacks impartiality," i.e., that the candidate's views would substantially impair his or her ability to follow the court's instructions and vote for death in appropriate cases. (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 423.) A trial court cannot simply assume that, because a candidate doubts the death penalty is a deterrent, he or she could never impose it. Here, G.P. directly rejected the assumption: "Well, I don't think that just because my idea is that [the] death penalty is not a deterrent, [it] doesn't keep me from imposing the death penalty [¶] . . . [¶] [I]f the circumstances surrounding the crime call for the death penalty, then I can make that decision."

The court also referenced several of G.P.'s specific responses to questioning about whether he could impose the death penalty. The court noted that when asked whether he could give the death penalty based on each of the special circumstances charged in the case, G.P. wavered before saying he thought he could, or probably could. The court further noted that G.P. "flat out said he could not [impose death on a getaway driver]. And, if the theory of the People in this case is an aider and abettor theory[,] that would preclude consideration of a potential penalty."

On the second point, the record is to the contrary. When asked, "What penalty would you impose on the person in the car, who didn't go inside?  He didn't shoot.  He wasn't the actual killer," G.P. responded, "I probably wouldn't impose the death penalty."  That a juror "probably wouldn't impose the death penalty" on a hypothetical getaway driver is not evidence the same juror could not impose the death penalty in an appropriate case.  Some getaway drivers, although guilty of first degree felony murder, may not even be death eligible.  (See *People v. Banks*, *supra*, 61 Cal.4th 788.)  Even those legally eligible might rationally be seen by competent jurors as less deserving of death than another who pulls the trigger.  In contrast, G.P. affirmed that he could cast a vote for death in other aiding and abetting scenarios and pointed to the facts of this case as circumstances that might justify a death sentence.

The People agree that G.P.'s answers show he could vote for death in a range of circumstances, but contend that because he "probably wouldn't" in others, he was impaired.  The law does not entitle the People to a jury composed only of those who would impose death in every factual scenario, but instead to a jury that can follow the court's instructions and conscientiously consider the appropriate penalty based on the proven aggravating and mitigating circumstances.  (See *People v. Stewart*, *supra*, 33 Cal.4th at p. 447.)

The court's remaining point, that G.P. hesitated before affirming he probably could vote for death in various single special circumstance hypotheticals, presents a closer question.  Only the trial court could observe G.P.'s demeanor and "the way he answers the questions."  However, even accepting the court's view of G.P.'s demeanor, as we must, the record does not contain substantial evidence that G.P. held views that would

31

"substantially impair" his ability to follow the law and the court's instructions. G.P.'s responses uniformly indicate he could maintain an open mind as to either life or death. Indeed, G.P. offered the facts of this case as precisely the sort of case in which he might be able to consider a death sentence.

"[U]nder applicable law, even a juror who 'might find it very difficult to vote to impose the death penalty' is not necessarily substantially impaired unless he or she was unwilling or unable to follow the court's instructions in determining the appropriate penalty." (*People v. Merriman* (2014) 60 Cal.4th 1, 53.) The prosecution, as the party seeking G.P.'s removal, had the burden of establishing he lacked impartiality and could not follow the court's instructions. (*Wainwright v. Witt, supra,* 469 U.S. at p. 423; *People v. Stewart, supra,* 33 Cal.4th at p. 445.) Here, nothing in the record suggests G.P. held inalterable anti-death penalty views or would find it difficult to vote for death when appropriate, nor does anything in the record give reason to doubt G.P. could act in accordance with the law and the court's instructions, as he repeatedly and without reservation indicated he would do. The court erred in excusing G.P. for cause.

### f. Harmless Error

In a capital case, the erroneous excusal of even one prospective juror for cause requires automatic reversal of the death sentence, although not the preceding guilt determinations. (*Witherspoon v. Illinois, supra,* 391 U.S. at pp. 516–518, 521–523; *People v. Riccardi* (2012) 54 Cal.4th 758, 783; *People v. Pearson, supra,* 53 Cal.4th at p. 333; *People v. Heard, supra,* 31 Cal.4th at p. 966.)

The People ask us to revisit this rule and hold any error harmless. The rule is not ours to revisit. It has been established in United States Supreme Court case law. (*Gray v. Mississippi* (1987) 481 U.S. 648, 659–668 (plur. opn. of Blackmun, J.); *id.* at p. 672 (conc. opn. of Powell, J.); see *People v. Riccardi, supra*, 54 Cal.4th at p. 783.) Even if a harmless error standard were to apply, the People fail to explain how the erroneous exclusion of at least four jurors could be deemed harmless. (See *Riccardi*, at p. 845 & fn. 6 (conc. opn. of Cantil-Sakauye, C. J.) [whatever doubt there might be about the impact of a single erroneous excusal for cause, the erroneous exclusion of numerous jurors inevitably will have an "appreciable impact on the final composition of the jury"].)

### 2. Wheeler/Batson *Motions*

We turn now to a different aspect of jury selection. The foregoing *Witherspoon/Witt* analysis involved *the court's* excusal of prospective jurors *for cause*. In this section we consider the *prosecution's* exercise of *peremptory challenges* against jurors not excused for cause. As we explain, the questions involve different principles.

Penny Sigler was a White woman. Armstrong, like Pearson and Hardy, is an African-American man. During jury selection, the prosecution exercised four peremptory challenges against African-American male prospective jurors. Armstrong objected to the first two peremptories as racially discriminatory. The court denied these motions, ruling no prima facie case of discrimination had yet been established. After the third peremptory, the court found a prima facie case, but after considering the prosecutor's proffered explanation, concluded the peremptory was being exercised for racially neutral reasons.

The court also revisited the two earlier challenges and asked the prosecutor to justify these peremptories. In light of the reasons given, the court ruled these excusals likewise were not based on race.

The court initially granted a fourth motion, but after a recess reversed itself and denied the motion. With the last African-American male eliminated from the pool, Armstrong moved for a mistrial. The court denied the motion, noting that both African-Americans and males were represented on the jury. The jury as seated included one African-American woman and five Caucasian men, but no African-American men.

Armstrong renews his objections on appeal, arguing that he was deprived of the right to equal protection and trial by a representative jury. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 16.) We conclude there was no error.

### a. *Legal Principles*

Peremptory challenges are "designed to be used 'for any reason, or no reason at all.'" (*People v. Scott*, *supra*, 61 Cal.4th at p. 387, quoting *Hernandez v. New York* (1991) 500 U.S. 352, 374 (conc. opn. of O'Connor, J.).) But there are limits: Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender. (*J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, 129; *Batson v. Kentucky* (1986) 476 U.S. 79, 97; *People v. Wheeler* (1978) 22 Cal.3d 258, 276; Code Civ. Proc., § 231.5.) Such use of peremptory challenges violates both a defendant's right to a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, and his right to equal protection under the Fourteenth Amendment to

the United States Constitution. (*People v. Parker* (2017) 2 Cal.5th 1184, 1211.)

"[T]here 'is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.' " (*People v. Hensley* (2014) 59 Cal.4th 788, 802; see *Purkett v. Elem* (1995) 514 U.S. 765, 768.) Under a now familiar three-step process, a defendant must first "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted; see *People v. Scott, supra*, 61 Cal.4th at p. 383.) The defendant's ultimate burden is to demonstrate that "it was more likely than not that the challenge was improperly motivated." (*Johnson*, at p. 170.) The same rules apply to state constitutional claims. (*People v. Chism* (2014) 58 Cal.4th 1266, 1313.)

Different standards apply to the review of first-stage and third-stage rulings. (Compare *People v. Sánchez* (2016) 63 Cal.4th 411, 434–435 [first-stage standard] with *People v. Winbush* (2017) 2 Cal.5th 402, 434–435 [third-stage standard].) Armstrong and the People agree that the third-stage standard applies to Armstrong's final two motions, but disagree as to the standard applicable to Armstrong's first two motions. Armstrong is correct that the third-stage standard applies to all four rulings.

In response to Armstrong's first two motions, following challenges to prospective jurors S.L. and R.C., the court originally found no prima facie case. However, after finding a prima facie case in connection with Armstrong's third motion, the court chose to revisit its earlier rulings and asked the prosecutor for a statement of reasons as to each. Upon reconsideration, the court reaffirmed its determination that these peremptories rested on race-neutral grounds. The court's actions were consistent with the law as it stood at the time of trial, which required courts finding a prima facie case to solicit and consider the prosecution's reasons for every other challenge against a member of the same group. (*People v. McGee* (2002) 104 Cal.App.4th 559, 570, disapproved by *People v. Avila* (2006) 38 Cal.4th 491, 549–550.)

Trial courts are no longer obligated to revisit their rulings on earlier *Wheeler/Batson* motions when they conclude the defendant has made out a prima facie case in connection with a later motion. (*People v. Hamilton* (2009) 45 Cal.4th 863, 899, fn. 10; *People v. Williams* (2006) 40 Cal.4th 287, 311; *People v. Avila, supra*, 38 Cal.4th at p. 549.) However, they have the power to do so in cases when a subsequent challenge places an earlier challenge in a new light. (*Avila*, at p. 552.) When a trial court revisits an earlier ruling, determines a prima facie case has been made, solicits reasons from the prosecutor, and rules on those reasons, its ruling is reviewed in the same fashion as any other third-stage ruling.

The court's reconsidered rulings on prospective jurors S.L. and R.C. based on reasons solicited from the prosecutor must be reviewed under the standards applicable to third-stage rulings. The record does not reveal whether the court reconsidered its earlier determination that no prima facie case had been made,

but when a trial court solicits reasons for earlier strikes it had previously found did not support a prima facie case, we will assume the court has reversed its earlier determination unless the record affirmatively demonstrates otherwise. Moreover, when the sincerity of the reasons given for excusing one juror bears on the sincerity of the reasons given for excusing a later juror, those reasons may be considered in evaluating the peremptory strike against the original juror. (*People v. Scott*, *supra*, 61 Cal.4th at p. 392; *People v. Riccardi*, *supra*, 54 Cal.4th at pp. 786–787.) There is some overlap in the reasons given for striking S.L. and R.C., and for later striking E.W. and R.P. Accordingly, we will review all four strikes as third-stage rulings.

At the third stage, the genuineness of the justification offered, not its objective reasonableness, is decisive. (*Purkett v. Elem*, *supra*, 514 U.S. at p. 769; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158.) "[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339; accord, *People v. Winbush*, *supra*, 2 Cal.5th at p. 434.) Because the trial court's credibility determination may rest in part on contemporaneous observations unavailable to the appellate court, we review that determination " ' "with great restraint" ' " and will accord it deference "[s]o long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered," affirming when substantial evidence supports the

ruling.  (*People v. Burgener* (2003) 29 Cal.4th 833, 864; accord, *People v. Lenix* (2008) 44 Cal.4th 602, 613–614.)

Armstrong contends no deference is due the trial court's determinations.  We cannot cast aside these findings so lightly. The record shows that over the course of Armstrong's four motions, the prosecutor made a comprehensive record of her reasons for every strike, whether challenged or not.  The trial judge took the opportunity to debate at length with counsel and consider thoughtfully the genuineness of the proffered reasons in light of his own observations.  Discussion of the final *Wheeler*/*Batson* challenge alone consumed more than 80 pages of transcript.  In the trial court, Armstrong bore the burden only of showing by a preponderance of the evidence that purposeful discrimination was behind the prosecutor's use of strikes.  (See *Johnson v. California, supra,* 545 U.S. at p. 170; *People v. Woodruff* (2018) 5 Cal.5th 697, 753.)  Once the trial court engaged in a reasoned examination of Armstrong's showing in light of the record and determined he had not proven discrimination, its findings became entitled to " ' "great deference on appeal" and will not be overturned unless clearly erroneous.' "  (*People v. Riccardi, supra,* 54 Cal.4th at p. 787, quoting *Miller-El v. Cockrell, supra,* 537 U.S. at p. 340.)

### b.  *African-American Men Are a Cognizable Class*

In the trial court, Armstrong argued the use of peremptories on S.L., R.C., E.W., and R.P. was motivated by race.  Once all four had been excused and his motions denied, Armstrong sought a mistrial on the ground that all African-American men had been removed from the jury panel.  The court denied the motion.  In this court, Armstrong contends the prosecutor's peremptories were exercised to discriminate

against African-American men specifically, rather than all African Americans.

Motions under *Wheeler* and *Batson* protect against the systematic exclusion of distinctive and protected groups from the jury pool. Armstrong, as the moving party, has the burden of establishing the challenged jurors are members of a cognizable class. (*People v. Jones* (2013) 57 Cal.4th 899, 916.) The record confirms that the four excluded jurors were African-American men, and this court's precedent establishes that, in addition to groups defined by either race *or* gender, groups lying at the intersection of race *and* gender are cognizable under *Wheeler*. (*People v. Cleveland* (2004) 32 Cal.4th 704, 734; *People v. Boyette* (2002) 29 Cal.4th 381, 422; *People v. Clair* (1992) 2 Cal.4th 629, 652; *People v. Motton* (1985) 39 Cal.3d 596, 605.) In line with that precedent, the Court of Appeal has held African-American men a cognizable class for *Wheeler* purposes. (*People v. Gray* (2001) 87 Cal.App.4th 781, 788–790.) The People contend that African-American men should not be considered a cognizable group, pointing to federal cases and to a concurring opinion disagreeing with the approach this court has taken. (*People v. Young* (2005) 34 Cal.4th 1149, 1235–1238 (conc. opn. of Brown, J.).) Settled law dictates otherwise.

### c. *Prospective Juror S.L.*

After *Hovey* voir dire, the prosecutor moved to excuse S.L. for cause. She expressed concern that S.L. "hesitated on quite a few of his decisions, especially those asking whether or not he could impose the death penalty." S.L favored rehabilitation, and the prosecutor was unsure whether S.L. was for or against the death penalty. Based on these and other views, the prosecutor

was of the "opinion that [S.L.] would be unable to impose the death penalty."  The court denied the motion.

Following regular voir dire, the prosecutor used a peremptory on S.L.  When initially denying Armstrong's *Wheeler/Batson* motion, the court referenced its earlier denial of excusal for cause, which it described as "a very close challenge," and concluded based on courtroom observations that the strike rested on S.L.'s reluctance to impose death:  "I can understand why [the prosecutor] would want to excuse this juror, because at the *Hovey* challenge, even though this court did not grant the challenge for cause, this juror had some reservations about imposing the penalty of death, based on his demeanor, [and] my belief is based upon the earlier challenge for cause during the *Hovey* process, that the motive to excuse this juror is not based on race, but because of [the prosecutor's] perceived perception of this juror's inability to be able to impose death at the penalty phase."  When denying the challenge for cause, the court had anticipated the juror later would be the subject of a peremptory:  "In making that ruling at that time I realized that there is an issue that this juror may, as the prosecutor [had] perceived at the time, may not be suitable, because that person waffled on whether they could impose death or not, believing in a rehabilitation system, and [that the defendant] has to commit a hateful crime."

As noted, the parties and court returned to the strike of S.L. when the court found a prima facie case in response to a subsequent *Wheeler/Batson* motion in connection with a different juror.  Defending the strike, the prosecutor highlighted numerous answers S.L. had given that might suggest reluctance to impose the death penalty.  The court credited this reason,

again noting that in its view S.L. nearly could have been excused for cause based on his death penalty views.

Initially, we note rulings made in response to assertions that "the juror did hesitate for [a] very long time before finally indicating that he could impose the death penalty" and based in part on observations of a juror's "demeanor" are particularly difficult to second guess. Only the trial court is in a position to observe these matters. The court can hear the juror's tone and inflection and see whether a juror hesitates or struggles with particular answers in a way the record may never reveal. (See *People v. Lenix*, *supra*, 44 Cal.4th at pp. 626–627.) Because the "trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes[,] . . . 'these determinations of credibility and demeanor lie peculiarly within a trial judge's province,' and 'in the absence of exceptional circumstances, we [will] defer to the trial court.' " (*Davis v. Ayala* (2015) 576 U.S. ___, ___ [135 S.Ct. 2187, 2201].)

What can be discerned from the record supports the prosecutor's and trial court's assessments of S.L. As the prosecutor recited, S.L. thought rehabilitation "important" and said, "[I]f there is anything about [a defendant's] background that I would feel maybe he could be rehabilitated, then I would vote for life imprisonment." For a first time offender without a prior history of "hateful decisions," S.L. thought "maybe life in prison would be better" and thus would lean toward voting for life. He gave conflicting answers as to whether he would require the People to prove just one, multiple, or all special circumstances before voting for death. S.L. would require proof of an intent to kill. S.L. "probably would" vote for life without the possibility of parole absent evidence the defendant would

reoffend in prison. S.L. thought life in prison was a more severe punishment than death because "the person would have the rest of their lives to think about what they had done."[6] S.L. was unsure whether California should abolish the death penalty.

A juror's reservations about imposing the death penalty are an acceptable race-neutral basis for exercising a peremptory. (E.g., *People v. Winbush, supra,* 2 Cal.5th at p. 436; *People v. Lomax* (2010) 49 Cal.4th 530, 572; *People v. Taylor* (2010) 48 Cal.4th 574, 603; *People v. Burgener, supra,* 29 Cal.4th at 864.) The view that life without possibility of parole is a more severe punishment than death is also an "obvious race-neutral ground[]" for challenging a prospective juror. (*People v. Davis* (2009) 46 Cal.4th 539, 584.)

Armstrong models his claim after *Miller-El v. Dretke* (2005) 545 U.S. 231. Two factors the Supreme Court weighed heavily there, the apparently discriminatory use of a Texas procedure called "jury shuffling" and direct evidence of a systemic, historical policy of excluding African-Americans from juries in the county, are absent here. (*Miller-El,* at pp. 253–255, 263–265.) Armstrong points to two other factors: the argument that similar White jurors were not challenged, and that the prosecutor engaged in disparate questioning. Neither of these factors is demonstrated in the record.

Armstrong identifies four jurors and an alternate who, in response to one of the two questions on the juror questionnaire

---

[6] In his questionnaire, S.L. also said life without possibility of parole meant a defendant would "have to live with [his crime] for the rest of [his] life" and "you have the rest of your life to be punished."

comparing death and life without possibility of parole, indicated life was, or were unsure whether it might be, a worse punishment for a defendant.[7] That these jurors were allowed to serve does not refute the trial court's determination that the prosecutor's concern was sincere. Examining the voir dire as a whole, the prosecutor showed by word and deed that she afforded significance to whether prospective jurors thought life in prison without parole a more severe penalty than death. She routinely questioned White jurors of both genders about the respective severity of death and life without parole. She challenged for cause or used peremptories against many White jurors who did not clearly view death as more severe. The prosecutor's concern extended even to jurors who considered the question in terms of how they themselves would compare the punishments if each were imposed on them.

In response to Armstrong's *Wheeler/Batson* motions, the prosecutor articulated her thinking about this consideration: "I don't believe that somebody . . . who believe[s] that life without the possibility of parole is a more severe punishment than death can actually impose the death penalty, because they believe that spending the rest of their life in prison would be the more severe punishment that could be imposed. [¶] I have exercised my peremptory challenges with respect to those jurors who have indicated" they hold that belief. Whether the prosecutor was

---

[7] The jury questionnaire asked: "Overall, in considering general issues of punishment, which do you think is **worse** for a defendant," death or life in prison without the possibility of parole? A second question asked, "Which do you believe is a more severe punishment," death or life without parole? In response to the second question, these jurors and the alternate, unlike S.L., indicated death was the more severe punishment.

right in her thinking, or whether we would share her concerns, is irrelevant. What matters is the genuineness of this view and its use as a criterion to distinguish among jurors. Exercising a peremptory to strike a juror who thinks death is a less severe punishment than life in prison without possibility of parole can be a "reasonable," race-neutral basis (*Miller-El v. Dretke*, *supra*, 545 U.S. at p. 248) if not used in a racially discriminatory way. This is not a case like *Miller-El* where the prosecutor displayed only selective concern. Instead, the issue was a frequent part of the prosecutor's questioning of both White and African-American jurors throughout the *Hovey* voir dire.[8]

That the prosecutor did not eliminate every juror who had even some doubt as to the relative severity of the penalties does not demonstrate that the trial court committed clear error in finding the concern genuine. The jury questionnaire asked both generally whether a death or life sentence was more severe and specifically which penalty was worse for the defendant. (See *ante*, fn. 7.) More than 30 percent of the jury pool indicated that life was the harsher penalty in response to both questions, and nearly half indicated as much on at least one of the two questions.[9] Based on this representation in the jury pool, one would have expected six of the 18 jurors and alternates to think

---

[8]  In addition to her use of peremptories, the prosecutor successfully moved to excuse for cause a juror who believed life without possibility of parole was the more severe penalty and for that reason would vote for life when the aggravating circumstances outweighed the mitigating circumstances.

[9]  By our count, of the 406 prospective jurors who answered, fully 190 indicated life was a harsher penalty than death in response to one question or the other, and 133 so indicated in response to both.

a life sentence was harsher both in general and specifically, and eight to have answered that way on at least one of the two questions. The prosecutor's focus on the issue produced a jury that contained *no one* in the first category, and only four jurors in the second.

The prosecutor focused on these questions because she believed they indicated a reluctance to impose death, but they were not the only ones that might reveal reluctance. The prosecutor was entitled to consider the full set of each juror's responses in deciding whether they could be persuaded to vote for death if appropriate. Each of the jurors who sat had other answers that might temper concern. For example, in contrast to S.L., each rejected the idea that the death penalty should be abolished.

Armstrong also identifies two jurors and an alternate who indicated rehabilitation or redemption might play a role in their thinking. Juror No. 4 believed that life might be appropriate for a remorseful first time offender who still had something to contribute to society, but did not think she could identify whether someone was remorseful, and was unequivocal about her ability to vote for death for a first time offender; S.L. would lean toward life for all first offenders. Juror No. 11 thought of death as an acceptable way to punish the unredeemable and would consider whether there was "hope for [the defendant] in our society" when weighing life and death. But unlike S.L., Juror No. 11 believed death was a more severe punishment. Unlike S.L., Juror No. 11 was clear that the death penalty should not be abolished. Her collective answers suggest openness to the death penalty in a wider range of

circumstances.[10]  Finally, Alternate Juror No. 6 endorsed life in prison for those who are "truly sorry and can be rehabilitated to some usefulness and good."  But nothing else in her questionnaire or voir dire suggested hesitation about imposing the death penalty.

Armstrong objects that the prosecutor used differential questioning for S.L. and other prospective jurors, who were not asked whether they could impose the death penalty under specific special circumstances and whether they would require that more than one special circumstance be proven.  The record refutes this contention.  The prosecutor employed the same general line of questioning with numerous prospective jurors who were not African-American men.

Finally, Armstrong argues that S.L.'s answers in his questionnaire and on voir dire gave no suggestion he could not follow the law.  While this may be true, the argument misses the point.  Unlike a for-cause challenge under *Witherspoon* and *Witt*, the issue here is not whether a juror held views that would impair his or her ability to follow the law.  Unimpaired jurors may still be the subject of valid peremptory strikes.  The issue instead is whether the prosecutor held a genuine race-neutral reason for exercising a strike.

"In a capital case, it is not surprising for prospective jurors to express varying degrees of hesitancy about voting for a death verdict.  Few are likely to have experienced a need to make a comparable decision at any prior time in their lives.  As a result, both the prosecution and the defense may be required to make

---

**10**      S.L. described the death penalty's only purpose as a tool to punish "people [who] murder and can't or won't stop even if they were in prison for life."

fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment.  These judgment calls may involve a comparison of responses that differ in only nuanced respects, as well as a sensitive assessment of jurors' demeanor." (*Davis v. Ayala, supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2201].) The trial court determined the use of a peremptory to excuse S.L. was the product of just such a judgment call.  Its determination was supported by substantial evidence and thus not clear error.[11]

### d.   Prospective Juror R.C.

Armstrong challenged the prosecution's use of its eleventh peremptory on R.C.  The court initially found no prima facie case.  It noted both R.C.'s failure to give direct answers and a developing friction between R.C. and the prosecutor as providing neutral reasons for the peremptory.  When the court retroactively solicited a statement of reasons following use of a peremptory to strike a third African-American male, the prosecutor explained she struck R.C. because he had memory issues, expressed an unwillingness to set aside his belief system, repeatedly gave nonanswers or revealed no opinions about the death penalty, and clashed with the prosecutor during voir dire.

---

[11]   Armstrong relies on *People v. Silva* (2001) 25 Cal.4th 345, 385 to argue that no deference is due the trial court's determinations and we should consider de novo the validity of this strike.  In *Silva,* we carved out an exception to the usual rule of deference because the record contained no support for the prosecutor's stated reasons and the trial court did not inquire into those reasons.  (*Id.* at pp. 376–377, 385–386.)  No similar justification for applying the exception appears here where, as discussed, the record supports the prosecutor's reasons and the trial court correctly recalled and considered the *Hovey* voir dire that bore on those reasons.

After hearing the prosecutor's explanations, which aligned with the reasons identified in the earlier ruling, the court accepted them.

The record supports the court's determination. R.C.'s questionnaire revealed little to nothing about his death penalty views. In voir dire, the prosecutor had an equally difficult time discovering his feelings on the subject. R.C. acknowledged he had memory difficulties. He also wrote on his questionnaire that he would not set aside his religious, social, and philosophical beliefs, although he later indicated he had misunderstood the question. Finally, review of the voir dire transcript confirms that exchanges between the prosecutor and R.C. became so combative that counsel and the court needed a sidebar to discuss whether the prosecutor could ask ancillary questions about why R.C. was resisting her inquiries.[12]  The

---

[12]  Sample exchanges:

Q: . . . what subjects did you teach?

A: You're amazing.  You're amazing. . . .

Q: You said I was amazing.  Did you mean that sarcastically?

A: I don't think I was laughing.

Q: Okay.  So why did you say I'm amazing?

A: I think you are.  It's simple to me.


Q: . . . would you say that you are for or against the death penalty?

A: Lady, I keep telling you the same thing.  I don't understand why you keep asking me the same thing.

Q: Can you —

A: I do not know your name, that's why I called you lady.

Q: That's nice. At least you didn't call me something else.

A: I don't have any of that other in my heart or in my mind. I just want some clear questions, so I can get some clear answers and get out of here.

Q: Okay. The question I have in my mind is based on your answers. Are you for or against the death penalty?

A: My opinion is the same as it was when we started this.

Q: So you have no opinion one way or the other?

A: No.

Q: Based on what you just said, it sounds like, to me, that you believe in the death penalty. Is that an accurate statement?

A: Whatever you want to believe is fine with me.

Q: But I've asked you what your opinion is about the death penalty, and you say you have no opinion. So that doesn't make sense to me that you can impose it, but you don't have an opinion about it.

A: I'm pretty clear, and it's okay with me. . . . Where I'm coming from is that I'm very clear about what I'm saying to you. And what you believe is personal, you know, I don't — I don't even — I'm not even willing to help you, but that's personal, I think.

Q: Can you come out here, look him in the eye and say "Death"?

A: Why are you asking me that?

Q: Because that's what you have to do at the end, if you come back with a death verdict. The court is going to poll you, he's going to ask what your verdict is, and the defendant is going to be sitting right there looking you in the eye. Can you look him back in the eye and say "Death"?

A: If you were the defendant, I could look you in your eye and say "Death."

prosecutor "felt that my client would not be best served by a juror who has a personality conflict with me as the lawyer, because I think that would get in the way of being able to evaluate the evidence . . . and would cause him to sway towards the defense." She was entitled to exercise a peremptory on these bases, and the court had ample basis for viewing the reason as genuine.

Armstrong concedes a conflict developed between the prosecutor and R.C., but lays blame for that conflict solely on the prosecutor for allegedly provocative, confrontational, and insulting questions. Our review of the voir dire does not support this interpretation. More fundamentally, the trial judge observed the questioning and concluded the personality conflict was genuine rather than manufactured by the prosecutor. In later explaining its ruling, the court said: "This juror . . . was, in this court's observation, a belligerent and hostile juror toward the prosecutor during her questioning. He refused to answer many of the same reasonable questions posed to the other jurors, specifically whether he could impose death . . . . The sum and substance of his answers were that You'll have to find out later." Armstrong dismisses that determination, but it appears to be a legitimate conclusion based explicitly on the court's observations.

Armstrong also contends that comparative juror analysis shows the reasons for R.C.'s excusal were pretextual, identifying a handful of other jurors who he asserts had similarly ill-formed views of the death penalty. That other prospective jurors may have been similar in one or two regards is not decisive. (*People v. Winbush, supra,* 2 Cal.5th at p. 443.) No other juror engaged the prosecutor in pointed verbal sparring in the way R.C. did. What occurred here was unique. Consequently, no other juror's

combination of questionnaire and voir dire responses is comparable to R.C.'s. The court did not abuse its discretion in determining that the prosecutor's race-neutral reasons for excusing R.C., including his nonresponsiveness and the tenor of the exchanges during voir dire, were genuine.

### e. *Prospective Juror E.W.*

When Armstrong challenged the use of a peremptory on prospective juror E.W., the court found a prima facie case and solicited the prosecution's reasons. After discussing a number of responses from E.W. that gave her pause, the prosecutor identified two as dispositive: "The two things that really bother me [are] that he believes that life without the possibility of parole is the most severe sentence and he also believes that since if the death penalty is imposed it cause[s] so much additional litigation, he doesn't believe it should be, just let it go, is what he says. To me that is indicative of what his verdict is going to be." Later, she reiterated that E.W.'s view of life without possibility of parole as the more severe sentence was her "primary motivation for exercising the peremptory challenge," and she had exercised peremptories against Whites who held the same view. The trial court evaluated these concerns and concluded they were genuine. Because the prosecutor's "concern has nothing to do with race[,] it has to do with whether or not [E.W.] could impose the death penalty," the court denied the motion.

The record substantiates that E.W. held the views the prosecutor ascribed to him. He wrote that the death penalty in its "current form is so slow that it's really useless. Justice delayed." He was "OK [with the death penalty] in principle, but if it creates so much additional litigation, maybe [the state]

should just let it go." He circled that life in prison without possibility of parole was a more severe punishment than death and added, "To me, I'd rather die." E.W. confirmed this view in voir dire. E.W. also thought "the appeals process so long that it tends to be life in prison."

Armstrong stresses that in E.W.'s questionnaire and voir dire, E.W. said his views would not affect his verdict. So does the dissenting opinion. (Dis. opn., *post,* at pp. 18–20.) They are correct about the record, but incorrect about its significance. E.W. was not excused for cause. Instead, the prosecution was entitled to use a peremptory if, as an advocate, she was concerned he would resist her view of the case. The ultimate issue in a *Wheeler/Batson* motion is not whether E.W.'s views would substantially impair his ability to vote for execution. The question instead is whether the prosecutor genuinely believed those views would incline E.W. to vote for life, and whether that belief was the true basis for the exercise of a peremptory. The trial court accepted this reason after voir dire. Armstrong and the dissent must do more than argue that the prosecutor's concerns might have been unfounded. The "inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are." (*People v. Melendez* (2016) 2 Cal.5th 1, 15.) The reasons must be sincere and nondiscriminatory, but they need not be universally shared.

The dissenting opinion accepts that " 'we exercise great restraint in reviewing a prosecutor's explanations and typically afford deference to a trial court's *Batson/Wheeler* rulings.' " (Dis. opn., *post*, at p. 23, quoting *People v. Gutierrez, supra,* 2 Cal.5th at p. 1172; see *People v. Melendez, supra,* 2 Cal.5th at p. 15 ["We review the trial court's determination with restraint, presume the prosecutor has exercised the challenges in a

constitutional manner, and defer to the trial court's ability to distinguish genuine reasons from sham excuses."].) We departed from that stance of deference in *Gutierrez*, but only because the proffered reasons lacked inherent plausibility or were contradicted by the record, and the trial court did not ask the prosecutor to elaborate. (*Gutierrez,* at pp. 1169–1172; see *People v. Silva, supra*, 25 Cal.4th at p. 386.) Here, in contrast, the reasons the prosecutor relied upon could well make a juror less desirable for a prosecution seeking the death penalty and were borne out by the record.

The dissenting opinion nevertheless offers two reasons for according the trial court's finding no deference. First, it suggests the court failed to challenge the prosecutor's assertion that she was striking all prospective jurors who believed life without parole was a more severe sentence than death. The dissenting opinion accepts that E.W. indicated he thought life without parole a more severe penalty than death, and that the prosecutor was correct in stating every seated juror had answered differently. But, according to the dissent, the trial court should have noticed that four other jurors or alternates indicated in response to a different question that life without possibility of parole was worse for defendants, and these answers should have spurred further inquiry from the court. (Dis. opn., *post*, at p. 16.)

However, when the prosecutor struck E.W. and the trial court considered the *Wheeler/Batson* challenge, only *one* of the four supposedly comparable jurors (Juror No. 5) was in the

box.[13]  That is, no juror in the box save E.W. had indicated life was the more severe punishment, and only one other thought life worse for a defendant.  That the trial court failed to observe *one* juror had answered *one* of the two questions on the questionnaire asking about the two penalties' relative harshness (see *ante*, fn. 7) in a manner that could have concerned the prosecutor does not show that the court's inquiry was insufficiently " 'sincere and reasoned.' " (*People v. Lenix, supra*, 44 Cal.4th at p. 614.)

The meager representation of these views on the panel, notwithstanding that nearly half the prospective jurors held such views, was the product of weeks the prosecutor spent pressing, challenging for cause, and striking jurors who did not consider death more severe than life in prison without parole. (See *ante*, pp. 42–45.)[14]  The trial court, unlike this one, observed

---

[13]  The prospective jurors who ultimately served as Jurors No. 4 and No. 9 were drawn randomly late in the process, after E.W. had been struck, when both sides were low on strikes and had to weigh carefully the pros and cons of the provisional panel against the characteristics of the dwindling pool of potential replacements.  Alternate Juror No. 5 was chosen much later as part of a separate process.

[14]  Two examples illustrate the prosecutor's approach. Prospective Juror No. 255, a White female, indicated in her questionnaire that life and death were equally severe penalties. The prosecutor questioned her about this and got her to agree that death was actually more severe.  Unsatisfied, the prosecutor later exercised a peremptory against the woman, and explained on the record that her sole reason was because she thought the juror still felt life was as severe a punishment as death.

Prospective Juror No. 9803, a White male, indicated on his questionnaire that life was more severe than death.  The

those weeks of questioning directed at jurors of all races and genders. Its observations informed its judgments about whether the prosecutor's stated concern was genuine. If the deference we are required to accord the trial court's finding (*Davis v. Ayala*, *supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2199]) means anything, it means that first-hand experience merits some weight. Given a justification that (1) was inherently plausible, (2) was largely supported by the record of the prosecutor's behavior, and (3) appeared to the trial court to be subjectively genuine, the trial court was not legally obligated to inquire further.

The record offers factual and statistical support for the genuineness of the prosecutor's concern about jurors who, like E.W., thought life without parole a more severe penalty. Unable to contest that the prosecutor winnowed out all jurors who thought life the more severe penalty, and nearly all who thought it a fate worse than death for the defendant, the dissent would shift the focus from whether the prosecutor's concern was genuine to whether specific statements she made in illustrating that concern were not just substantially accurate but universally true. This misstates the nature of the trial court's inquiry, and ours. That the prosecutor may have succeeded in eliminating only nearly all, rather than all, the jurors the

---

prosecutor asked him whether this answer meant he would vote for life. The juror said it did not. Again unsatisfied, the prosecutor struck him and gave as her sole reason that the juror felt life a more severe punishment than death.

These and other instances also reflect the prosecutor's consistent reluctance, for prospective jurors of all races and genders, to put faith in voir dire answers that hedged on views expressed in the jurors' questionnaires.

dissent deems comparable does not call into question the sincerity of her concern.

Second, the dissenting opinion concludes that, on its view of the cold record, the prosecutor should have been no more concerned by E.W.'s death penalty views than those of several jurors the prosecutor did not strike. (Dis. opn., *post*, at pp. 18–20.) The conclusion fails because the jurors are not comparable. E.W. thought life without possibility of parole the more severe penalty; Juror No. 5, the only one of the comparison jurors on the panel when E.W. was struck, did not, explaining that "[d]eath is the end forever — prison for life is still life." Where E.W. described the death penalty as "useless" and a candidate for abandonment, Juror No. 5 saw the death penalty as a "needed though sad way to punish someone." The same is true of other jurors later added to the panel and now compared to E.W. with the benefit of hindsight. Juror No. 4 thought death more severe ("Death is final") and wrote: "The punishment has to fit the crime and I think that some[]times [the death penalty] is warranted." Juror No. 9 believed death the more severe penalty and wrote "I have no problem with this law" and "In some cases[,] it is justice." Finally, Alternate Juror No. 5 thought the death penalty more severe and wrote of the penalty, "There may be times when it is necessary." A prosecutor could rationally distinguish between prospective jurors who thought death a more severe and necessary penalty and one who thought it less severe and useless. The record supports the prosecutor's assertion that she had more reason to be concerned about E.W.'s potential verdict than a verdict from jurors the dissent and Armstrong posit as comparable.

Armstrong also identifies jurors who indicated they had not thought about their support or opposition for the death

56

penalty before. But the proffered explanation was not that E.W. had never thought about the death penalty. The prosecutor was concerned instead about the views he had actually developed: E.W. could not say he was affirmatively in favor of the death penalty, and he thought perhaps it should be abandoned. Finally, Armstrong points out other jurors who, like E.W., indicated that they thought the death penalty was imposed too seldom or too randomly. But the prosecutor never identified this as a basis for striking E.W. Her concern was that E.W. thought a life sentence more severe than the death penalty, which should perhaps be discontinued. Seated jurors and alternates did not share these views.

Armstrong and the dissenting opinion also highlight that the prosecutor mentioned E.W.'s profession, engineering, as an area of concern, explaining she feared he might put her to a higher standard of proof. (Dis. opn., *post*, at p. 8.) The prosecutor did not identify this as one of the "two things that really bother me" about E.W., and the trial court did not originally consider the prosecutor to have proffered it as a justification. We may infer that in the prosecutor's eyes the juror's profession alone was an insufficient reason to exercise a strike.[15]

The fact another engineer, Juror No. 11, remained on the jury does not demonstrate the expressed doubt about engineers, as part of the overall calculus, was insincere. The seated juror

---

[15] Later in voir dire, the prosecutor described her general approach to strikes and listed five areas of principal concern, none of which focused on a juror's profession: (1) belief that life in prison was as or more severe a punishment than death; (2) belief in rehabilitation; (3) bad experiences with the police; (4) reluctance to judge others; and (5) prior service on a hung jury.

differed from E.W. on each of the two grounds the prosecutor gave as her principal reasons for exercising a strike. Unlike E.W., Juror No. 11 indicated death was a more severe punishment than life in prison. Unlike E.W., Juror No. 11 did not think the state should consider abandoning the death penalty. An engineer with these views might be acceptable, even if not ideal, while an engineer with views like E.W.'s was deemed too big a risk to take in selecting the jury. Comparative juror analysis has force "when the compared jurors have expressed 'a substantially similar *combination* of responses,' in all material respects, to the jurors excused." (*People v. Winbush*, *supra*, 2 Cal.5th at p. 443.) No such combination appears here.

The dissenting opinion is unclear how other considerations, such as more prosecution-friendly views at the penalty phase, might outweigh concerns that a prospective juror would be harder to persuade at the guilt phase. (Dis. opn., *post*, at p. 9.) This is not a conundrum. A prosecutor with an exceptionally strong guilt phase case but a weaker penalty phase case might be willing to trade some small risk of an unfavorable guilt phase verdict for better odds of a desired penalty phase verdict. A prosecutor need not strike every single juror with a particular trait, even those with other redeeming qualities, to demonstrate that concerns about the trait are genuine.[16]

---

[16] Alternatively, it is possible that in the course of reviewing 50-page questionnaires, each containing responses to 237 questions, from more than 400 jurors — more than 20,000 pages in all — the prosecutor, defense counsel, and trial court all overlooked Juror No. 11's profession. Neither at the time nor in a later new trial motion rearguing the *Wheeler/Batson* motions

This court and the United States Supreme Court have previously recognized that comparative juror analysis can be a useful tool, but also one that has some "inherent limitations." (*People v. Lenix, supra,* 44 Cal.4th at p. 622; see *Snyder v. Louisiana* (2008) 552 U.S. 472, 483.) "Moreover, the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled. As we noted in *People v. Johnson* (1989) 47 Cal.3d 1194: '[T]he particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or [by] peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors.' (*Id.* at p. 1220.)" (*Lenix,* at p. 623.)

"Each juror becomes, to a certain degree, a risk taken. Voir dire is a process of risk assessment. As the Supreme Court

_____

did defense counsel argue the challenge to E.W. and the failure to strike Juror No. 11 were inconsistent.

observed, 'potential jurors are not products of a set of cookie cutters.' (*Miller-El* [*v. Dretke*], *supra*, 545 U.S. at p. 247, fn. 6.) Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 624.)

Four months later, when denying Armstrong's motion for a new trial, the court determined E.W.'s profession was an additional genuine race-neutral basis for the strike. In opposing the new trial motion, the People did not identify E.W.'s profession as the principal reason for the strike. The court compared E.W. to Prospective Juror No. 5128, a White male engineer. As with E.W., the prosecutor questioned No. 5128 about whether his training would lead him to speculate about every conceivable possibility. Like E.W. and unlike seated Juror No. 11, this prospective juror also gave other answers reflecting views on the criminal justice system that concerned the prosecutor. She unsuccessfully moved to excuse him for cause, and then was able to excuse him by stipulation.[17] The prosecutor's approach to No. 5128 is consistent with the subjective view that while an engineering background alone

---

[17] The prosecution and defense settled on the final set of alternate jurors by mutual agreement, rather than by exercising alternating peremptory challenges. Prospective Juror No. 5128 was not on the agreed-upon list.

may not warrant a peremptory, in combination with other factors it may make the juror less desirable.[18]

The prosecutor also mentioned a handful of reasons she deemed less significant, which the trial court did not rule on. We have cautioned against a trial court "tak[ing] a shortcut in its determination of the prosecutor's credibility, picking one plausible item from [a] list and summarily accepting it without considering whether the prosecutor's explanation as a whole" suggests pretext. (*People v. Smith* (2018) 4 Cal.5th 1134, 1157.) No cherry-picking was involved here. The prosecutor herself highlighted the considerations that concerned her most. The trial court took her at her word and evaluated those reasons for their genuineness and neutrality. Once they passed muster, it was not error to omit express consideration of secondary factors.

Nor, in any event, do these lesser factors undermine the trial court's credibility finding. The voir dire transcript and E.W.'s questionnaire show that E.W. indicated prosecutors "tend to be overzealous to convict," and had had negative experiences with the police. He believed misconduct by police and lawyers was inadequately punished and that failure was one of the most important problems with the criminal justice system. In addition, E.W. was neither firmly for nor against the

---

[18] The trial court specifically relied on the prosecution's approach to No. 5128 in finding the prosecution's concerns about E.W.'s profession genuine. The dissenting opinion would consider the prosecution's questioning of that prospective juror de novo and conclude it demonstrates the prosecution actually sought to rehabilitate other engineers. (Dis. opn., *post*, at pp. 12–14.) We do not read the cold record as revealing any significant disparity. We should be most hesitant to substitute our judgment, long after the fact, for the trial court's comparison of the examinations it observed.

death penalty, thought the system needed reform, and was familiar with legal terminology. These are factors that, considered with all other circumstances, could fairly give an advocate pause. They provide no basis for us to substitute our judgment for that of the trial court's and conclude the prosecutor acted with racial bias. (See *People v. Lenix, supra,* 44 Cal.4th at p. 613.)

An advocate who chooses jurors based on racial bias commits grievous misconduct, for "the very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality,' [citation], and undermines public confidence in adjudication." (*Miller-El v. Dretke, supra,* 545 U.S. at p. 238.) In guarding against such corrosive impropriety, judges on the trial court, and on appellate panels, must be vigilant. The first line of vigilance rests with those in the trial court, who see and hear the questions, responses and nuances of the interaction.

The rules of review also require vigilance, and humility. Appellate courts must surely call out misconduct. But we are aided in this endeavor by the trial judge who ruled in the first instance. In the face of a trial court's supported factual findings regarding the genuineness of the prosecutor's racially neutral reasons for exercising a strike, we should be hesitant to draw a contrary conclusion unless well-founded on fair inference, rather than surmise.

The trial court in this case determined that the strike of E.W. was made on genuine, race-neutral bases. Reviewing that ruling with the deference precedent requires, the record supports the trial court's conclusion.

### f. *Prospective Juror R.P.*

R.P. was the last African-American man in the jury pool. Before seeking to excuse him, the prosecutor requested a sidebar and offered the reasoning behind every peremptory she had exercised. The prosecutor then gave detailed reasons for striking R.P. As with S.L. and E.W., she struck him in part because he thought life in prison a more severe sentence than death. He also believed that the death penalty was overused, especially against African-Americans, and that African-Americans in general were overincarcerated. Third, R.P. had sat on two prior murder cases, and his service had troubled him. Finally, one of R.P.'s sons had had a negative experience with the Long Beach Police Department. A second son had recently been robbed at gunpoint in Long Beach, and the investigation was ongoing. The prosecutor feared any future negative interactions with the Long Beach police could impair R.P.'s impartiality.

The court concluded that the prosecutor's peremptory was based on her belief R.P. would not impose the death penalty, and that reason was race-neutral. Nonetheless, it initially granted the *Wheeler/Batson* motion because it believed R.P. could impose a death verdict. Because the prosecutor's race-neutral reason was "mistaken," the court rejected the prosecutor's exercise of a peremptory.

The prosecutor pointed out that the court was applying the wrong standard. Whether R.P. was unable to vote for death was a consideration in a for-cause challenge. A *Wheeler/Batson* motion, by contrast, examines whether the prosecutor genuinely believes a juror will be resistant to her side of the case and is striking him for that race-neutral reason. After asking the prosecutor to restate her reasons, the court reversed itself and

denied the *Wheeler/Batson* motion. The court specifically concluded that three of the prosecutor's reasons were genuine and race-neutral: R.P. found judging others disturbing; thought the death penalty was overused, especially against African-Americans; and was concerned about the overincarceration of African-Americans in general.

The record supports the court's determination. R.P. had served as a juror in two noncapital murder trials. He wrote that "the aftermath is always disturbing." Asked about this answer, R.P. explained: "I carry it with me. I go back over it, I guess — I don't want to say second guess, but it's disturbing. It's disturbing to a certain degree when you do judge your fellow man — for me it is." Twice more in follow-up questioning he described the process of jury service as disturbing. In later questioning, R.P. described his jury experience as "unsettling."

R.P. thought the death penalty was "[s]ometimes overused," especially on "certain segments of our society." His views were informed by other states that imposed moratoriums on executions and reports of prisoners released based on DNA evidence. In light of this, R.P. believed the death penalty was "a serious thing, and we . . . shouldn't take it lightly. [¶] [M]y bottom line is, it's a very serious thing and . . . we shouldn't rush to anything. I think we should look at all the facts." Sometimes death could be the correct punishment, but "[i]n other instances, as we've seen — in some instances there have been mistakes made, so I think we should be very careful about what we do."

R.P. later clarified that his concerns extended to incarceration in general: "[T]here are people being released across the country, where either evidence was not substantiated, DNA, a lot of different avenues, and my thought

behind that was we have to look at things beyond just face value, we have to make certain that things are true." R.P. was concerned as well that, in his view, the African-American community was substantially overrepresented both generally in prison, and on death row in particular. This disparity suggested something was "fundamentally wrong" with the criminal justice system.

R.P.'s expressed concerns are held by many. Yet they also provide a legitimate reason why a prosecutor, tasked with securing the conviction of an African-American defendant for a crime heavy with racial overtones, might view R.P. as a problematic juror. The court's determination that the reason was genuine and race-neutral finds support in the record. The concerns R.P. had about the criminal justice system are not unique to African-Americans: A prospective juror of any ethnicity might equally share them. In exercising peremptory challenges, advocates may excuse jurors who have such concerns, so long as their reasoning does not rest on impermissible group bias. (See *People v. Smith*, *supra*, 4 Cal.5th at p. 1153; *People v. Winbush*, *supra*, 2 Cal.5th at p. 439.)

Further, given R.P.'s responses about jury service in noncapital cases, the prosecutor might be legitimately concerned that he might lean toward a verdict that would be emotionally less taxing. The record supports the court's acceptance of that reason. No other juror gave such answers.

Armstrong relies on comparative juror analysis to argue that the prosecutor's reasons were pretextual. He contends seated White Juror Nos. 2, 4, 5, 10, and 11, and Alternate Juror Nos. 5 and 6 were likewise apprehensive in varying degrees about the prospect of imposing a death verdict. But unlike R.P.,

none of these jurors had had the visceral experience of serving on two murder juries and dealing with the emotional aftermath. Moreover, the court did not rely on a single concern expressed by the prosecutor, but on three. None of the jurors Armstrong identifies also expressed concern about overuse of the death penalty or bias in the criminal justice system. Overlap on one concern will seldom be sufficient: "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable." (*People v. Lenix, supra*, 44 Cal.4th at p. 624.)

The Constitution makes clear that group bias is unacceptable. Cases decided over decades have condemned it. Prospective jurors must be evaluated as individuals, in light of all the information gleaned during voir dire. What matters is the full range of responses and whether, because of widespread similarities aside from race or gender, a reasonable comparison casts doubt on the honesty of the neutral reasons offered. Armstrong has not identified jurors with such similarities as to cast doubt on the trial court's acceptance of the prosecutor's reasons as genuine. Accordingly, he has failed to carry his burden.

B.  *Guilt Phase Evidentiary Issues*

1.  *Refusal to Admit Out-of-court Evidence of Racial Slurs*

Before trial, the prosecutor advised that she intended to introduce the statement defendant gave to detectives after his arrest. She offered it as a statement of a party opponent (Evid. Code, § 1220), but sought to redact parts of it as "self-serving hearsay." Armstrong had related that as he, Hardy, and

Pearson were walking toward the bus stop, "some racial slurs were said by somebody that was on the opposite side. [¶] . . . [¶] They was like 'I hope—like I hope you all die niggers.' 'Niggers I hope you all die.'" In response to further questioning, Armstrong said he heard: "Like, 'Fuck you niggers' or 'the niggers are gonna die.'" After the statements were made, Hardy started walking across the street and encountered a woman, later identified as Sigler. Pearson and Armstrong followed him. Over defense objection, the court ordered the quoted statements redacted. Armstrong contends his statements as to what he heard should have been admitted. He is correct; the ruling was error.

The interview Armstrong gave to detectives was an out-of-court statement offered against him by the prosecution, thus falling within the hearsay exception for statements of a party. (Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party"].)[19] The prosecutor argued, in essence, that the words Armstrong attributed to

---

[19] The text of Evidence Code section 1220 defines the exception as embracing "a statement" made by a party offered by an opposing party. The exception is listed in Division 10, Chapter 2, Article I of the Code, titled "Confessions and Admissions," and section 1220 is titled "Admission of party." However, Evidence Code section 5 provides: "Division, chapter, article, and section headings do not in any manner affect the scope, meaning, or intent of the provisions of this code." As a result, and as a general rule, any otherwise relevant "statement" of a party is admissible against him, regardless of whether the statement would meet the narrower definition of a confession or admission. (*People v. Rodriguez* (2014) 58 Cal.4th 587, 637; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1049; Simons, Cal. Evid. Manual (2018) § 2:28, p. 105.)

Sigler were a second level of hearsay. They were not Armstrong's statements but those of Sigler, who was not a party to the litigation. As a result, Sigler's statements, recounted by Armstrong, did not fall within the exception. If Sigler's statements had been offered for their truth, the prosecutor would have been correct. Sigler's words were nonetheless admissible for two reasons: (1) they were not hearsay, and (2) they were admissible under Evidence Code section 356.

In arguing that the redacted statements should remain, the defense was not seeking to prove that all members of Armstrong's race, which Sigler rudely maligned, would die, or even that Sigler hoped for such an outcome. Accordingly, the defense did not seek to offer Sigler's words for the truth of their content. Instead, the defense urged the victim's statements were relevant to explain the subsequent conduct of Armstrong and his companions and to support a conclusion that when they assaulted Sigler, their motive was revenge, rather than robbery or rape. "When evidence that certain words were spoken . . . is admitted to prove that the words were uttered and not to prove their truth, the evidence is not hearsay. (People v. Smith [(2009)] 179 Cal.App.4th 986, 1003 . . . .)" (Simons, Cal. Evid. Manual, *supra*, § 2:5, p. 84.)

To the extent the prosecution argued Sigler's slurs fell outside Evidence Code section 1220, because the prosecution was not seeking to introduce them, they nevertheless were admissible under section 356, often called the rule of completeness. That rule provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing

is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.)

"The purpose of [Evidence Code section 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156.) The rule reflects the " ' "equitable notion" ' " that a party seeking introduction of one part of a statement cannot selectively object to introduction of other parts necessary to give context. (*People v. Melendez, supra*, 2 Cal.5th at p. 26.) "Although framed as an expansion of the concept of relevancy, Evidence Code [section] 356 most often operates in the manner of a hearsay exception." (Simons, Cal. Evid. Manual, *supra*, § 1.16, p. 21.)

The redaction here allowed the prosecution to create a misleading impression. As Armstrong originally recounted, the men were walking toward a bus stop when someone shouted racial slurs from across the street. The yelling prompted Hardy to cross the street and confront the person who had shouted. When he approached Sigler, Hardy asked if she would perform an act of oral sex on all three men for $50. Sigler responded with a grunted "no," walked past Hardy and Pearson, and slapped Armstrong as she passed him as well. Sigler then walked a distance away, extended both middle fingers, and hurled additional racial epithets. The full version recounts that the men were unaware of Sigler's presence and only approached her

after she insulted them in a racially-charged manner. The redacted version makes it appear that the men approached Sigler because she was a woman walking alone at night and began the encounter by asking her to engage in an act of prostitution. If the prosecution wanted to introduce the remainder of Armstrong's statement under Evidence Code section 1220, Armstrong was entitled to include the redacted portion under section 356 to avoid mischaracterization.[20]

As we discuss in greater detail when addressing the claim of prosecutorial misconduct, we conclude that the error does not require reversal of the guilt judgments. (See *post*, pt. II.D.1.)

## 2. *Refusal To Admit Victim's Toxicology Report*

Before trial, the prosecution moved to exclude a medical examiner's toxicology report showing Sigler was intoxicated on the night she was killed. Defense counsel argued Sigler's intoxication was relevant to corroborate Armstrong's testimony about the racial epithets, and to support an argument that Armstrong acted out of revenge rather than an intent to rob, rape, or kill. The court granted the motion, ruling the relevance, if any, of Sigler's potential intoxication was substantially outweighed by other considerations. (Evid. Code, § 352.)

---

[20] A defendant may not use the prosecution's introduction of his out-of-court-statements as an opportunity to introduce "extraneous statements contained in the recording" that might favor him, without the burden of testifying and submitting to cross-examination. (*People v. Gurule* (2002) 28 Cal.4th 557, 604; see *id.* at p. 605.) But the rule is different when, as here, the portions the prosecution seeks to redact are not extraneous but integral to an understanding of the course of conduct the admitted portions describe.

The toxicology report is the same report we concluded was properly excluded as irrelevant in *People v. Hardy*, *supra*, 5 Cal.5th at pages 86–87. In *Hardy*, as here, the defendant argued the report tended to corroborate allegations that Sigler had issued racial slurs before she was raped and killed. The report was properly excluded there because "the prosecution never argued that Sigler did not yell a racial slur; indeed, she said during her opening statement that the jury would 'hear testimony or evidence that [Sigler] made some racial remarks, and that [Hardy] and his companions approached her as a result of these.'" (*Id.* at p. 87.) In Hardy's trial, the prosecution acknowledged Sigler's shouted slurs. The fact she was intoxicated at the time carried little to no relevance because the content of her shouting was not a "disputed fact." (Evid. Code, § 210.)

The calculus is somewhat different here. Unlike Hardy's trial, the prosecution successfully excluded portions of Armstrong's original statement to police about Sigler's racial slurs. It then contended no slurs were made. When the prosecution chose to deny the slurs took place, its tactical decision put the intoxication question in a different light. Given alcohol's effect on judgment and self-control, her intoxication could have a "tendency in reason" (Evid. Code, § 210) to explain why a diminutive woman, alone at night on a deserted street, would start a confrontation with three larger strangers. That explanation would have been consistent with the defense theory and Armstrong's testimony.

We need not decide whether exclusion of the toxicology report was an abuse of discretion. Any error was harmless, as explained in greater detail in connection with our discussion of prosecutorial misconduct. (See *post*, pt. II.D.1.)

### 3. *Refusal To Admit Evidence of Alternate Theory Concerning Semen Deposit*

Armstrong sometimes stayed at his mother's home, which was searched pursuant to warrant. Police recovered a stained cream-and-black shirt. Tests revealed the stain consisted of a large amount of semen and small amount of blood. DNA in the stain matched Armstrong.[21] The prosecution argued that Armstrong wore the shirt during the attack and the semen deposit showed his direct participation in Sigler's rape.

The People called Armstrong's girlfriend, Jeanette Carter, to testify. On cross-examination, Carter said she had never seen the cream-and-black shirt before. Defense counsel then began to ask about Armstrong's practices after having intercourse. The court sustained a relevance objection.

During a recess, defense counsel offered that he was trying to find out whether Armstrong sometimes put his shirt back on after intimacy with Carter. If he did, the presence of semen on the shirt might be explained. The court adhered to its ruling. Carter had never seen the shirt, so any response to such a question would have been irrelevant.

Armstrong renews his evidentiary claim, but the court's ruling was correct. Carter twice said she had never seen the shirt. Whether Carter had ever seen Armstrong put on a *different* shirt after intercourse with her could have no bearing on how semen found its way on to *that* shirt. Nor did Armstrong

---

[21] The laboratory was unable to determine the source of the blood.

urge that the semen might have been deposited after a liaison with a different partner.[22]

### 4. *Admission of Kendrick's Testimony*

Keith Kendrick testified that on December 30 or 31, 1998, he was watching the news with Pearson, Armstrong, and a third man when a report about the Sigler murder came on the air. Kendrick said, "Oh, I know who did that. [¶] . . . [¶] Killer Kev [Kevin Pearson] did it." Armstrong whispered to Pearson, "How did [Kendrick] know?" Pearson then recounted details of the crime, including that Hardy, Armstrong, and he had encountered a woman, raped her in the bushes, and then beat her with a stick. The People introduced a tape of Kendrick's January 1999 police interview, which included additional specifics from Pearson and Kendrick's conversation in Armstrong's presence. Armstrong sat silently throughout the discussion.

Before Kendrick's testimony, Armstrong objected that Pearson's statements were inadmissible hearsay and allowing Kendrick to testify about them would violate his confrontation clause and due process rights. The People argued that Armstrong, by listening and saying nothing, had adopted Pearson's statements as his own admissions. The court agreed, finding neither a hearsay bar nor a confrontation clause problem. Armstrong renews his constitutional claims on appeal.

---

[22] Armstrong did not offer this evidence as that of "habit or custom" under Evidence Code section 1105. Thus, the record contains no evidence he could have satisfied the foundational requirements of that provision.

The court was correct. "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) " 'Under this provision, "[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." ' " (*People v. Chism, supra,* 58 Cal.4th at p. 1297.) Armstrong implied that Kendrick's accusation of Pearson was true when he asked, "How did he know?" Armstrong then did not challenge the recitation of events, instead sitting silently as Pearson recounted Armstrong's participation in the crime. Kendrick's recitation of Pearson's statements fell within the adoptive admission exception to the hearsay rule.

Nor does introduction of this testimony raise constitutional concerns. Adoptive admissions pose no problem under the Sixth Amendment of the United States Constitution and *Crawford v. Washington* (2004) 541 U.S. 36 because " '[t]he "witness" against the defendant is the defendant himself,' " notwithstanding that the words the defendant adoptively admitted were spoken by someone else. (*People v. Jennings* (2010) 50 Cal.4th 616, 662; see *People v. Cruz* (2008) 44 Cal.4th 636, 672–673; *People v. Roldan* (2005) 35 Cal.4th 646, 711,

fn. 25.)  The high court has never suggested that the *Crawford* rule bars admission of a defendant's own statement.

Armstrong objects that Pearson was potentially unavailable for cross-examination because he might choose to invoke his right against self-incrimination.  But Pearson's availability is immaterial.  Through his silence, Armstrong adopted Pearson's statements as *his own* and bore witness against himself.  Armstrong cannot complain that he was deprived of his confrontation clause rights by the introduction of his own admissions.

Moreover, only testimonial hearsay falls under the *Crawford* doctrine.  (*Ohio v. Clark* (2015) 576 U.S. __, __ [135 S.Ct. 2173, 2179–2180]; *People v. Rangel* (2016) 62 Cal.4th 1192, 1214.)  Whether a statement is testimonial turns on " 'whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." ' "  (*Rangel*, at pp. 1214–1215, quoting *Clark*, at p. 2180.)  Determining whether a statement is testimonial can often be challenging, but is straightforward here:  Pearson's casual, conversational statements to Kendrick, adopted by Armstrong, were not intended to substitute for court testimony.  Because the hearsay was not testimonial, its admission did not give rise to a *Crawford* violation.

### 5. *Refusal To Admit Evidence of Pearson's Reputation*

On direct examination, Armstrong described things he did at Pearson's direction.  After Armstrong testified he was afraid of Pearson, counsel asked why.  The court overruled the prosecutor's relevance objection, but when Armstrong

answered, "Because of his reputation —," the court interrupted and directed a sidebar. This exchange followed:

"The Court: The defendant was ready to testify about Kevin Pearson's reputation.

"[Defense Counsel]: I was not aware of that.

"The Court: It would be hearsay, obviously, because it would be something that he heard from sources. There's no foundation for reputation evidence. We're not going to have a trial on Kevin Pearson's reputation, are we?

"[Defense Counsel]: No.

"The Court: I just want to make sure it's not an area that I cut you off.

"[Defense Counsel]: No. [¶] . . . [¶]

"The Court: After the word 'Yes,' the rest of the answer is stricken.

"[Defense Counsel]: Okay."

Armstrong argues that his fear of Pearson and the reason for it was improperly excluded. The argument fails. His testimony that he was afraid of Pearson was allowed to stand. As for evidence of Pearson's reputation, counsel indicated he did not intend to explore this subject and lodged no objection to its exclusion. Accordingly, the claim is forfeited. (Evid. Code, § 354, subd. (a); *People v. Capistrano* (2014) 59 Cal.4th 830, 867.) Nor, as Armstrong now argues, would an objection and offer of proof have been futile. (See Evid. Code, § 354, subd. (b).) Throughout the trial, the court showed a willingness to rethink its rulings in light of arguments from counsel. If counsel had wanted to explain what Armstrong would say and why it was

either not based on hearsay or otherwise properly admissible, he could have done so.

Further, Armstrong fails to show how the omitted testimony would have significantly altered the evidentiary picture. The jury heard a great deal about Pearson's callous violence on the night of the crime and that Kendrick called him "Killer Kev." Nothing in this record undermines the conclusion that Pearson was a man rightly to be feared.

### 6. *Sufficiency of the Evidence To Support the Torture-murder Special Circumstance*

Armstrong contends there was insufficient evidence to support the torture-murder special-circumstance finding. On review, we examine the entire record in the light most favorable to the prosecution to determine whether a rational jury could have found the circumstance true beyond a reasonable doubt. (*People v. Hardy*, *supra*, 5 Cal.5th at p. 89.)

To prove a torture-murder special circumstance, the prosecution must show that the defendant intended both to kill and " 'to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 65.) Intent may be inferred " 'from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1187.)

Here, there was ample evidence that Armstrong intended to cause extreme pain. Prosecution evidence showed Armstrong assisted Pearson and Hardy in raping, stomping, and beating Sigler, and repeatedly inserting a wooden stake into her vagina. Armstrong himself kicked the victim several times. Armstrong had reason to know Sigler was alive until the end of the assault

and that she was in considerable pain. The autopsy showed 11 broken bones and more than 100 distinct injuries. Contrary to Armstrong's assertion, the jury was not limited to considering only his self-serving statements that he thought Hardy's and Pearson's actions were "wrong" and "scandalous." Given the extended duration of the encounter, the brutal escalation of the attack, and Sigler's extraordinary pre-mortem injuries, a rational jury could conclude that Armstrong intended to inflict extreme pain and suffering.

## C. *Instructional Issues*

### 1. *Circumstantial Evidence Instructions*

The jury received four standard instructions on circumstantial evidence, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1. These instructions advised that if circumstantial evidence supported two reasonable interpretations, the jury "must" adopt the interpretation more favorable to the defendant. If, instead, one interpretation appeared reasonable and the other unreasonable, the jury "must" adopt the reasonable interpretation. Armstrong argues that telling the jury it must adopt a reasonable interpretation of the evidence if the alternative was unreasonable deprived him of the right to have a jury convict only upon proof beyond a reasonable doubt.

We have repeatedly rejected this contention. (E.g., *People v. Delgado* (2017) 2 Cal.5th 544, 572–573; *People v. Watkins* (2012) 55 Cal.4th 999, 1030; *People v. Bonilla* (2007) 41 Cal.4th 313, 338; *People v. Koontz* (2002) 27 Cal.4th 1041, 1084–1085.) "[T]hese instructions properly direct the jury to accept an interpretation of the evidence favorable to the prosecution and unfavorable to the defense only if no other 'reasonable' interpretation can be drawn. Particularly when viewed in

conjunction with other instructions correctly stating the prosecution's burden to prove defendant's guilt beyond a reasonable doubt, these circumstantial evidence instructions do not reduce or weaken the prosecution's constitutionally mandated burden of proof or amount to an improper mandatory presumption of guilt." (*People v. Kipp* (1998) 18 Cal.4th 349, 375.) Armstrong offers no new authority that would support reconsideration.

### 2. *Instruction on Juror Unanimity Concerning the Theory of Murder*

The jury was instructed on three different theories: deliberate and premeditated murder (CALJIC No. 8.20), felony murder (CALJIC No. 8.21), and murder by torture (CALJIC No. 8.24). (See Pen. Code, § 189.) At the People's request, the court instructed the jury that it need not unanimously agree on which theory was correct in order to find Armstrong guilty of murder in the first degree.

Armstrong contends the court was required to instruct that the jury must agree unanimously on which theory, if any, supported a guilty finding, and the failure to do so violated the state and federal Constitutions. He acknowledges that we have repeatedly rejected this claim, but seeks to preserve the issue for federal court review. Armstrong relies on *People v. Dillon* (1983) 34 Cal.3th 441, which, he contends, establishes that premeditated murder and felony murder have distinct elements and must be distinct crimes. He then urges that under *Schad v. Arizona* (1991) 501 U.S. 624, 636–637, due process required the jury be instructed it must unanimously agree on one theory or another.

We have consistently stated this argument is a misreading of *Dillon.* While it is true that under *Dillon* " 'the two forms of murder have different elements[, nevertheless] there is but a single statutory offense of murder.' [Citations.] When, as here, the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed, the jury need not unanimously agree on the theory under which the defendant is guilty." (*People v. Benavides* (2005) 35 Cal.4th 69, 101; see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479.) *Schad v. Arizona, supra,* 501 U.S. 624, does not require otherwise. (*People v. Grimes* (2016) 1 Cal.5th 698, 727–728; *Benavides*, at p. 101.)

### 3. *Instructions on Conspiracy*

Although no conspiracy was charged, the jury was instructed on its elements. (CALJIC Nos. 6.10.5, 6.11, 6.12.) Armstrong contends the instructions should not have been given. The claim is forfeited for lack of objection. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Armstrong does not argue that the forfeiture should be excused on the ground his substantial rights were affected. (See Pen. Code, § 1259; *People v. Henriquez* (2017) 4 Cal.5th 1, 33.)

The claim is also meritless. Armstrong's undeveloped assertion is unclear. To the extent he argues a conspiracy charge is a prerequisite to these instructions, the law is to the contrary. The prosecution may prove an uncharged conspiracy as a means of establishing liability for the underlying substantive crime. (*People v. Hajek and Vo, supra,* 58 Cal.4th at pp. 1200–1201; *People v. Valdez* (2012) 55 Cal.4th 82, 150.) Evidence of a conspiracy, whether charged or not, is sufficient to support the giving of conspiracy instructions. (*People v.*

*Rodrigues* (1994) 8 Cal.4th 1060, 1134.) To the extent Armstrong argues "there was no evidence that such a conspiracy ever existed," he concedes otherwise in his briefing, complaining that the court "permitted the jury to hear extensive evidence of the uncharged conspiracy."

Armstrong also urges that the instructions reduced the prosecution's burden of proof. We have rejected this argument before and do so again. (*People v. Hajek and Vo, supra*, 58 Cal.4th at pp. 1201–1202; *People v. Valdez, supra*, 55 Cal.4th at p. 150.) He contends the lack of a charged conspiracy deprived him of notice and an opportunity to defend himself. He did not make this argument below, and it is likewise without merit. Armstrong had ample pretrial notice that the prosecution would proceed in part on the theory that Armstrong, Pearson, and Hardy conspired to rob and murder Sigler. The prosecutor's voir dire questioning and the preceding trials of Pearson and Hardy demonstrated this theory was likely to be pursued. Given Armstrong's awareness of the prosecution's theory, there was no unfair surprise and no due process violation. (See *Hajek and Vo*, at pp. 1201–1202.)

Finally, Armstrong argues that the conspiracy instructions allowed the jury to find him death-eligible based on a crime that cannot be subject to the death penalty. It is true conspiracy to commit murder will not support a death sentence in California. (*People v. Hernandez* (2003) 30 Cal.4th 835, 864–870.) However, Armstrong was not found eligible for the death penalty based on conspiracy, but on a jury determination that he was guilty of first degree murder with special circumstances.

D. *Misconduct and Bias*

1. *Prosecutorial Misconduct*

Armstrong contends that the prosecutor committed misconduct in empaneling the jury, seeking to exclude admissible evidence, and engaging in other improper conduct throughout trial. Most challenges fail. One is well-founded but did not prejudice Armstrong.

Prosecutorial misconduct requires reversal when it "so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury." (*People v. Watkins*, *supra*, 55 Cal.4th at p. 1031.)

Armstrong's first few claims derive from and duplicate his other assignments of error. He objects that the prosecutor improperly had qualified jurors excused. Several jurors were erroneously excused for cause, an error requiring reversal of the penalty verdict. He is obtaining relief on that basis. He contends that the prosecutor based peremptory challenges on race and gender. This argument has been rejected. (See *ante*, pt. II.A.)

Most of the allegations of misconduct not tied to claims we have already addressed are also without merit. Armstrong contends that the prosecutor was aggressive and hostile toward defense counsel and twice accused counsel of lying to the court. Defense counsel responded in equal measure with his own accusations of lying. Because it occurred outside the jury's presence, this acrimony could not have affected the verdict.

Armstrong complains the prosecutor used "hypertechnical and unnecessary objections" during his direct testimony. To the extent these objections were meritorious, making them could not have been misconduct. Evidentiary objections often are technical and their "necessity" a question of tactics and perspective. While a handful of objections were overruled, there is no reason to conclude they would have injected unfairness into the trial. Armstrong also takes issue with the cross-examination, which he characterizes as hostile, repetitive, and argumentative, with frequent accusations of lying. Even accepting this characterization at face value, it supplies no basis for a claim of misconduct. This was the cross-examination of the defendant in a capital murder case. Effective and legitimate cross-examination may involve assertive and even harsh questioning. It is permissible to accuse a witness of being untruthful. Simply because an examination is confrontational does not make it argumentative.[23] Armstrong identifies no line of questioning, and the transcript reveals none, that crossed over any boundaries of fair play or that would have led the jury to decide this case on anything other than the facts and the law.

Armstrong objects that the prosecutor asked leading questions of direct witnesses. He cites no question or questions, simply pointing to the entire transcript for a half-dozen witnesses. To the extent Armstrong failed to object, the claim is forfeited. (*People v. Pearson* (2013) 56 Cal.4th 393, 426.) To the

---

[23] "An argumentative question is a speech to the jury masquerading as a question. . . . An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony . . . ." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)

extent Armstrong objected and the court sustained the objection, we discern no effect on the jury or its verdict. As for the third possible category, leading questions and answers erroneously allowed to stand, Armstrong identifies not a single such question and does not explain how any such questions or their answers could have engendered unfairness.

However, Armstrong is correct that the prosecutor misled the jury during closing argument. She told the jury, as a matter of fact, that in response to Armstrong's loud comments about the coming new year, Sigler called back, "Happy New Year." There was no such evidence. The prosecutor directly asked Armstrong during cross-examination whether Sigler had made such a statement. He unequivocally denied it and no other testimony supported the prosecutor's assertion.

Some inaccuracies in closing argument may flow from innocent misrecollection, but it is difficult to credit that explanation here when what Sigler said was a principal point of contention. The prosecutor moved to redact from Armstrong's initial police statement the assertion that Sigler yelled racial slurs before the attackers encountered her on the street. (*Ante*, pt. II.B.1.) She also persuaded the court to exclude evidence of Sigler's intoxication. (*Ante*, pt. II.B.2.)

To be clear, assertively arguing fine points of evidence will seldom constitute misconduct, and an advocate is generally entitled to rely on a court's ruling, even one held erroneous on appeal. What an advocate cannot do is knowingly mislead the jury. (*People v. Daggett* (1990) 225 Cal.App.3d 751, 758.) "[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct." (*People v. Kirkes* (1952) 39 Cal.2d 719, 724; accord, *People v. Hill*

(1998) 17 Cal.4th 800, 828 [" 'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct' "]; *People v. Bolton* (1979) 23 Cal.3d 208, 212.)

These principles are not new ones. In *People v. Kelley* (1977) 75 Cal.App.3d 672, 680, Justice Fleming observed, "As the representative of the government a public prosecutor is not only obligated to fight earnestly and vigorously to convict the guilty, but also to uphold the orderly administration of justice as a servant and representative of the law. . . . As the court said in *Berger v. United States* (1935) 295 U.S. 78, 88: . . . . '[The Prosecutor] may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones.' "

A prosecutor may honestly urge that a defendant lied. Convincing the jury that he did so is a potent weapon. An advocate may argue that the record contains no evidence of a given fact when that is the case. She may invite the jury to accept reasonable inferences from the record, even if the evidence is in dispute. (*People v. Daggett, supra*, 225 Cal.App.3d at p. 757.) But she may not mislead the jury as to what the record actually contains.

However, as inappropriate as the prosecutor's argument was here, that argument and the actual or assumed evidentiary errors that preceded it (see *ante*, parts II.B.1 and II.B.2) are insufficient to warrant reversal of the guilt determinations. Defense counsel conceded in closing argument that there was ample evidence of Armstrong's guilt on charges of robbery, rape, rape in concert and kidnapping. Even under Armstrong's own version of events, he facilitated each of the crimes he attributed to his compatriots. After Pearson said he was "fixing to BKC

this bitch," Armstrong held Sigler down while Pearson robbed, beat, and raped her. After Pearson said, "This ain't over yet, bitch. Let's kill this bitch," Armstrong kicked Sigler repeatedly, knowing she was in great pain. Aware of Pearson's intent to kill Sigler, Armstrong jumped over a fence and held it down so Sigler could be thrown over it and moved to a more remote area. Rather than leaving, he stood at the ready while Pearson beat Sigler with the stake and while Pearson and Hardy sexually penetrated her with it. Armstrong then helped Pearson move Sigler a second time, further up the freeway embankment. After they abandoned the body, Armstrong disposed of both the stake and Sigler's clothes.

Of course, it would have been no defense to argue that Sigler engaged in offensive conduct. Nevertheless, it is noteworthy that no heat of passion argument was made here. Indeed, excised statements and toxicology results would have also been consistent with a theory that the torturous brutality of the 30-minute assault was sparked by Sigler's drunken insults.

Based on Armstrong's statements to investigators and his girlfriend, his adoptive admission of Pearson's statements, and his own trial testimony, it is not "reasonably probable that a result more favorable to [Armstrong] would have been reached" at the guilt phase. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

While the excluded evidence would not have provided a defense against guilt for these offenses, the calculus of prejudice might well be different at the penalty phase. In determining whether to impose the ultimate punishment, the jury could consider evidence of Sigler's conduct as "[a]ny other circumstance which extenuates the gravity of the crime even

though it is not a legal excuse for the crime." (§ 190.3, factor (k).) Because the death verdict is being set aside for error in jury selection, we need not discuss this question further.

"Our public prosecutors are charged with an important and solemn duty to ensure that justice and fairness remain the touchstone of our criminal justice system. In the vast majority of cases, these men and women perform their difficult jobs with professionalism, adhering to the highest ethical standards of their calling. This case marks an unfortunate exception . . . . We are confident the prosecutors of this state need no reminder of the high standard to which they are held, and that the rule prohibiting reversals for prosecutorial misconduct absent a miscarriage of justice in no way authorizes or justifies the type of misconduct that occurred in this case." (*People v. Hill* (1998) 17 Cal.4th 800, 847–848.)

### 2. *Judicial Bias*

Armstrong argues he was deprived of a fair trial, in violation of various constitutional guarantees, because the court was biased against him. The rulings and remarks Armstrong relies upon do not demonstrate bias.

As with Armstrong's prosecutorial misconduct claim, his allegation of judicial bias is largely derivative. Armstrong contends the court demonstrated bias by erroneously excusing jurors for cause. On the merits, some jurors were improperly excused, requiring reversal of the penalty verdict. However, a judge's "rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112.) The same is true of Armstrong's argument that the court showed bias by failing to see through the prosecutor's assertedly

pretextual reasons for excusing African-American men and by excluding various items of evidence. We have evaluated and rejected the underlying claims on the merits. The court's rulings, supported by substantial evidence and rules of evidence, do not demonstrate bias against Armstrong.

To the extent Armstrong's claim is not derivative, it is largely forfeited. Armstrong "never claimed during trial . . . that his constitutional rights were violated because of judicial bias. 'It is too late to raise the issue for the first time on appeal.' " (*People v. Guerra, supra*, 37 Cal.4th at p. 1111.) Only claims of "pervasive judicial bias" are preserved in the absence of an objection, on the ground that objection in that instance may be futile. (*People v. Banks* (2014) 59 Cal.4th 1113, 1177.)

No pervasive bias is evident here. Armstrong identifies three times when the court derided defense counsel's questions as "unintelligent," "unintelligible," or "incomplete." Armstrong also points to a handful of occasions when, in response to a prosecution objection, the court supplied a basis for the objection, then sustained it, or otherwise handled objections in ways with which Armstrong disagrees. Finally, Armstrong identifies as indicative of bias one sidebar conversation. Armstrong had been personally admonished before testifying to not discuss remorse. Both sides agreed the issue was irrelevant at the guilt phase. After he violated that admonition, the court remarked at sidebar that Armstrong "knows better" than to testify as he did.

Without reciting every remark Armstrong identifies as signifying bias, we observe that the court's statements were justified. For example, the court described as "unintelligible" this defense question: "Between you and Jeanette — when you

talked to Jeanette, did the subject matter of how it was that you were in contact with this lady?" The court made its remark only in the context of asking counsel to rephrase after the prosecutor and witness both indicated they could not understand the question. The court's sidebar remark that Armstrong knew better than to testify as he did was warranted in light of an express direction not to do so.[24] Collectively, the statements Armstrong points to do not suggest "any judicial misconduct or bias, let alone misconduct or bias that was 'so prejudicial that it deprived defendant of a " 'fair, as opposed to a perfect, trial.' " ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 540.)

---

[24]     Before Armstrong took the stand, the following exchange occurred:

"The Court:  On the remorse and sympathy issue, do you agree remorse and sympathy are not issues in the guilt phase?

"[Defense Counsel]:  That's correct.

"The Court:  And your client is not going to testify how sorry he is . . . and he is asking for their forgiveness, is that correct?

"[Defense Counsel]:  That's correct.

"The Court:  Mr. Armstrong is present in court.  I make that [a] court order.  He is not to do so.  If he is to do so, I will interrupt immediately during the proceedings and advise the jury that we have had this instruction and your client has failed to obey the court's instructions.  All right, I want to make that crystal clear."

Despite this instruction, when asked why he confessed, Armstrong testified, "I wanted to tell [the police I knew nothing], but since it was on my heart, heavy, I just told them."  An objection ensued.  At sidebar, the court accepted that counsel was not trying to elicit testimony in violation of its order, but observed that Armstrong knew better than to answer as he did.

E. *Cumulative Error*

Armstrong contends errors during the guilt phase of his trial were prejudicial when considered in combination. We have evaluated the two actual or assumed evidentiary errors and related prosecutorial misconduct together for purposes of assessing prejudice and have concluded Armstrong was not prejudiced at the guilt phase. (*Ante*, pt. II.D.1.)

F. *Penalty Phase Evidentiary Errors and Challenges to the Constitutionality of California's Death Penalty*

Armstrong asserts various evidentiary errors occurred during his penalty phase trial. He also contends California's death penalty is unconstitutional. Because the penalty judgment is reversed based on erroneous exclusion of jurors for cause, we need not address these claims. The People retain the discretion to determine whether to retry the penalty phase on remand.

## III. DISPOSITION

We reverse the judgment of death. We remand to the superior court with directions that it correct the abstract of judgment to reflect that (1) each of Armstrong's convictions was pursuant to a jury verdict, not a guilty plea; (2) Armstrong was sentenced to 8 years for rape on count six; (3) the determinate portion of his sentence is 30 years; and (4) in addition to the determinate term for rape in concert, sexual penetration with a foreign object, and sexual penetration with a foreign object while acting in concert, on counts four, six and seven, Armstrong received a 25-year-to-life term under section 667.61, subdivisions (a) and (d), which was then stayed under section

667.61, subdivision (g). We affirm the judgment in all other respects.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**

**CHIN, J.**

**KRUGER, J.**

PEOPLE v. ARMSTRONG

S126560


Dissenting Opinion by Justice Liu


Defendant Jamelle Armstrong, a black man, was sentenced to death for raping, torturing, and murdering Penny Sigler, a white woman.  Armstrong objected to the prosecutor's peremptory strikes of four black men in the jury venire.  (See *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.)  The prosecutor gave reasons for each strike, and the trial court rejected Armstrong's *Batson* claims.  Today's opinion upholds the trial court's rulings.

This is a case with "definite racial overtones" that " 'raise[ ] heightened concerns about whether the prosecutor's challenge was racially motivated.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 78 (*Hardy*).)  In the capital trial of Armstrong's confederate, Warren Hardy, the same prosecutor struck every black juror she could have removed and gave six reasons for striking a black man, Frank G., from the main panel.  Although this court rejected Hardy's *Batson* claim, our opinion acknowledged that three of the reasons for striking Frank G. on their own appeared "weak" or "not . . . very convincing." (*Hardy*, at pp. 82, 83.)

In this case, the prosecutor struck four black male jurors, leaving no black man on the jury.  As to the strike of Prospective Juror R.C., I agree the record supports the trial court's finding that the prosecutor was credibly concerned that she and R.C. had a "personality conflict." (Maj. opn., *ante*, at pp. 48–50.)  But

as to the other three strikes, Armstrong raises more substantial objections. Especially troublesome, in my view, is the strike of Prospective Juror E.W. The prosecutor gave eight reasons for this strike, but in several respects, the reasons were not supported by the record. The discrepancies were numerous and significant; they were not " 'isolated' " misstatements or "slight" misrepresentations. (*Hardy*, *supra*, 5 Cal.5th at p. 80.) The trial court did not probe these discrepancies, nor did it probe the prosecutor's disparate treatment of nonblack jurors who were more similar to E.W. than she suggested in explaining her strike. Had the trial court examined these anomalies, perhaps the prosecutor could have elaborated further on her concerns. But "the duty of [the trial court] and counsel to ensure the record is both accurate and adequately developed" was not fulfilled here (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172 (*Gutierrez*)), and we are left with a record that is not sufficient to sustain the trial court's ruling. Because "[e]xcluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude' " (*ibid.*) that requires reversal, I must dissent from today's affirmance of Armstrong's convictions.

## I.

"We review a trial court's determination regarding the sufficiency of tendered justifications with ' "great restraint," ' " upholding the ruling if it is supported by substantial evidence. (*Gutierrez*, *supra*, 2 Cal.5th at p. 1159.) But "[a] trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Ibid.*; accord, maj. opn., *ante*, at p. 37.) A "*reasoned*" effort involves, at a minimum, evaluating whether a proffered justification is supported by the record and, where a

proffered reason is "not borne out by the record," either "reject[ing] [the] reason or ask[ing] the prosecutor to explain further." (*Gutierrez*, at p. 1172.) A trial court "should be suspicious" and should probe further when " 'the facts in the record are objectively contrary to the prosecutor's statements . . . .' " (*People v. Silva* (2001) 25 Cal.4th 345, 385.) To prevail on a *Batson* claim, the defendant must show "it was more likely than not that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170.)

Prospective Juror E.W., the third black man struck by the prosecutor, was a 28-year-old homeowner in Signal Hill who worked as a satellite engineer for Boeing and had been the student body vice-president at the University of California at Irvine. He planned on returning to school for postgraduate studies and considered focusing on astronautics, law, or business. At voir dire, E.W. said he could vote for either life imprisonment without the possibility of parole (LWOP) or death in the appropriate case, and that his decision would depend on the evidence.

Today's opinion concludes that the trial court properly focused its evaluation on those reasons the prosecutor said "really bother[ed]" her about E.W. — i.e., E.W.'s belief that LWOP is a more severe sentence than death, and his belief that the death penalty, when imposed, causes too much additional litigation. (Maj. opn., *ante*, at p. 51.) The court acknowledges that the prosecutor mentioned E.W.'s profession, engineering, as an additional area of concern. But the court says that because "[t]he prosecutor did not identify this as one of the 'two things that really bother [her]' about E.W., . . . [w]e may infer that in the prosecutor's eyes the juror's profession alone fell short of a sufficient reason to exercise a strike." (*Id.* at p. 57.)

3

At the outset, it must be noted that this characterization of the record is significantly incomplete. What the record actually shows is that the prosecutor gave eight different reasons for striking E.W. (numbered (1) to (8) below), and it is dubious to say the prosecutor did not regard E.W.'s engineering background as a main reason for the strike.

When the prosecutor began her explanation for striking E.W., she said, (1) "[F]irst of all, the one thing that really bothers me" is that E.W. "believes that life without the possibility of parole is the most severe sentence." But the prosecutor did not stop there. (2) "The next thing that concerns me," she said, "is his training, as an engineer. He is trained to look at all possible doubt. There is no way I can prove this case to him beyond a reasonable doubt." As discussed further below, the prosecutor devoted significant effort to exploring this issue with E.W. during voir dire.

The prosecutor went on to give six additional reasons: (3) "He also in his questionnaire has indicated that he believes that the prosecutor tends to be over-zealous to convict. I find that to be a problem. I personally am a very assertive and aggressive prosecutor." (4) "He also, in his questionnaire has indicated that he feels that the death penalty needs to be reformed just like affirmative action . . . ." (5) "[H]e indicates that he has had bad experience with police officers in his questionnaire. . . . [¶] . . . [H]e indicated during *Hovey* voir dire, . . . 'Police officers have pulled me over more than once for questionable reasons.' He also indicated today that more often than not it's happened here in Long Beach. This case involves Long Beach police officers, in fact, the majority of my witnesses will be related to the Long Beach Police Department." (6) "He also indicates that what he thinks are the three most important problems with the criminal

justice system is bad police officers, and lawyers and that the system is biased against economically disadvantaged defendants." (7) "He indicated on his questionnaire, as well as, during *Hovey* voir dire that he finds that the death penalty causes so much additional litigation that we should just let it go. [¶] I asked him during *Hovey* voir dire, 'Would it be accurate to say that you are for the death penalty?' He said, 'I don't have feelings one way or the other for it.' And he kept indicating that he is neither for nor against. [¶] To me, if someone cannot say that they believe in the death penalty, I don't believe they can impose it." (8) "Then another thing that bothers me about this particular juror, he seems to have a lot of information about the law. . . . He already has additional information that other jurors don't have. He is not in the same position that other jurors are currently."

The prosecutor concluded by saying: "The two things that really bother me [are] that he believes that life without the possibility of parole is the most severe sentence and he also believes that since if the death penalty is imposed it caused so much litigation, he doesn't believe it should be, just let it go, is what he says. To me that is indicative of what his verdict is going to be. [¶] . . . Also the fact that he is an engineer, there are no other engineers in this panel and he is the only engineer and he is trained to look for all possible doubt. [¶] And I find that I can never reach that standard. I cannot possibly prove this case beyond all possible doubt nor is that the standard and that's what he does in life look for all possible doubt." After a reply from defense counsel, the prosecutor then said her "primary motivation" for striking E.W. was that he "indicated life without the possibility of parole is the most severe sentence." At that point, the trial court credited the prosecutor's first

reason and, without examining any of the other reasons, upheld the strike.

Four months later, in denying Armstrong's motion for a new trial, the trial court returned to the *Batson* issue and said: "[E.W.] is an engineer and very articulate.  This juror, however, indicated that he believes that life without parole is the most severe sentence.  If this is the crime that deserves the most severe punishment, the People believe that he automatically would vote for life without parole.  Therefore, it is unlikely under any circumstances that he would vote for death.  *More importantly*, the People articulated that, as an engineer, this juror will likely require to make the People prove the case more than beyond a reasonable doubt.  Both these reasons are race-neutral; this court found and now finds that [E.W.] was excused with the use of People's peremptory for race-neutral reasons . . . ."  (Italics added.)

There is no question that E.W.'s belief that LWOP is a more severe sentence than death was, according to the prosecutor, an important reason for the strike.  But so was the prosecutor's concern about E.W.'s training as an engineer.  The fact that the trial court originally upheld the strike of E.W. after examining and crediting only the LWOP concern does not mean "the trial court did not originally consider the prosecutor to have proffered [the engineering concern] as a justification."  (Maj. opn., *ante*, at p. 57.)  As the record shows, the prosecutor thoroughly explored the engineering concern during voir dire, and she repeatedly identified it as a reason for the strike.  The trial court, in later ruling on the new trial motion, described this concern not merely as an "additional genuine" reason for the strike (maj. opn., *ante*, at p. 60), but as *more important* to the prosecutor's credibility than the LWOP concern.  In today's

6

opinion, the court substitutes its own judgment and refuses to acknowledge what the record clearly indicates: that both the prosecutor and the trial court considered the engineering concern to be a significant reason for the strike.

As I explain in a moment, a careful examination of the engineering concern reveals significant cause for suspicion, and the LWOP concern does not fare any better. But before undertaking that analysis, it bears mention that the trial court's and this court's narrow focus on those reasons implicates concerns we recently expressed in *People v. Smith* (2018) 4 Cal.5th 1134 (*Smith*). Our unanimous opinion in *Smith* cautioned that a prosecutor's " 'laundry list' " approach to justifying a peremptory strike "carries a significant danger: that the trial court will take a short-cut in its determination of the prosecutor's credibility, picking one plausible item from the list and summarily accepting it without considering whether the prosecutor's explanation as a whole, including offered reasons that are implausible or unsupported by the prospective juror's questionnaire and voir dire, indicates a pretextual justification. A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility. [Citation.] In assessing credibility at the third stage of a *Batson*/*Wheeler* decision, trial courts should attempt to evaluate the attorney's statement of reasons as a whole rather than focus exclusively on one or two of the reasons offered." (*Id.* at pp. 1157–1158.)

As *Smith* instructs, the trial court should have examined the prosecutor's stated reasons for striking E.W. "as a whole." (*Smith, supra,* 4 Cal.5th at p. 1157.) To be sure, the trial court could have assigned greater weight to the reasons that appeared

more important to the prosecutor. And it follows that problems with such reasons should carry greater weight in the trial court and on appellate review. (See *Foster v. Chatman* (2016) 578 U.S. __, __ [136 S.Ct. 1737, 1752] (*Foster*) ["[W]e would expect at least *one* of the two purportedly principal justifications for the strike to withstand closer scrutiny. Neither does."].) At the same time, if other reasons are implausible or unsupported by the record, that is a relevant consideration bearing on the prosecutor's credibility. In *Hardy*, the same prosecutor gave six reasons for striking a black male juror, Frank G.; we upheld the strike, but not before examining all six reasons and finding them race-neutral when "[c]onsidered in combination." (*Hardy*, *supra*, 5 Cal.5th at p. 79; see *Foster*, at p. __ [136 S.Ct. at pp. 1751–1754] [finding *Batson* violation upon considering all relevant circumstances, including analysis of "principal" and "secondary" justifications among the 10 reasons stated by the prosecutor for striking a black juror].) By minimizing the engineer issue and by conducting no meaningful examination of other proffered reasons that the trial court also left unexamined, today's opinion fails to properly account for weaknesses in those reasons that provide cause for suspicion.

## II.

Let us begin with the prosecutor's stated concern that "as an engineer," E.W. "is trained to look at all possible doubt. There is no way I can prove this case to him beyond a reasonable doubt." In articulating this concern, the prosecutor said, "[T]here are no other engineers in this panel and he is the only engineer." This was not true. Juror No. 11, whom the prosecutor had accepted, was a white woman who had worked as an engineer for Conoco Phillips for over 20 years. The trial court did not notice this discrepancy, and the record contains no

explanation for the prosecutor's misstatement. Today's opinion says that Juror No. 11 had more favorable views on the death penalty than E.W. (maj. opn., *ante*, at pp. 57–58) and that the prosecutor "might be willing to trade some small risk of an unfavorable guilt phase verdict for better odds of a desired penalty phase verdict" (*id.* at p. 58). But if the prosecutor's concern was, as she put it, that engineers are "trained to look at all possible doubt" and that she "cannot possibly prove this case beyond all possible doubt," it is not clear how an engineer's views on the death penalty could outweigh that concern.

Had the trial court noticed that Juror No. 11 was an engineer, the court might also have recalled that when Juror No. 11 came up for voir dire, the prosecutor asked no questions about Juror No. 11's engineering training or how that training would affect her application of the beyond a reasonable doubt standard. In fact, there were 20 prospective jurors in the overall pool who had engineering training or who had worked in jobs involving engineering. Thirteen were dismissed by stipulation without the prosecutor questioning them about their engineering training. Among the remaining engineers, four came up for voir dire before E.W.: Juror No. 11, who was seated; then Prospective Juror No. 7420 and Prospective Juror No. 9961, both of whom the prosecutor excused for cause; and then Prospective Juror No. 8423, whom the defense excused with a peremptory strike. The prosecutor extensively questioned all four of these jurors about a variety of topics, but she did not ask them any questions about their training or work as engineers.

E.W. was the first engineer whom the prosecutor questioned about his engineering background, and it was only after questioning E.W. that the prosecutor questioned other

engineers (the remaining two) about their engineering background. Moreover, it is evident that the prosecutor pursued a different line of questioning with E.W. than with the remaining two engineer jurors after E.W. Here is what the prosecutor asked E.W.:

> "Ms. Locke-Noble: Okay. Now, in your training does that cause you to look for all possible doubt?
>
> "[E.W.]: To look for all possible doubt?
>
> "Ms. Locke-Noble: Yes.
>
> "[E.W.]: I would say that it helps me to see many different angles.
>
> "Ms. Locke-Noble: Okay. Do you look for all the possible doubts there might be in your job?
>
> "[E.W.]: Yeah. I certainly consider them, sure.
>
> "Ms. Locke-Noble: And do you have this okay, what if this, what if this, then this? 'What if this' type bantering about in your job?
>
> "[E.W.]: We tend to try to, like I said, see things from many different angles. And yeah, what if this happened, then what will happen because of it? Cause and effect, sure."

The prosecutor also questioned E.W. about the role that speculation played in how he approached a specific area of his work, i.e., writing operations manuals for telemetry satellites:

> "Ms. Locke-Noble: Okay. So do you write into these chapters if this happens, do this?
>
> "[E.W.]: Correct.

"Ms. Locke-Noble:  Okay.  So you kind of speculate as to a problem that might occur, and then you write a solution for it?

"[E.W.]:  Sure."

After E.W., the next engineer up for voir dire was Prospective Juror No. 4629, a white male.  The prosecutor also questioned this juror about his engineering background, first (as with E.W.) eliciting statements that he was "trained to speculate" in his work.  But then, the prosecutor pursued a line of questioning that she had not pursued with E.W., focusing on whether Juror No. 4629's engineering training would impair his ability to apply the beyond a reasonable doubt standard of proof:

"Ms. Locke-Noble:  Okay.  As an engineer, do you always say, well, what if this and what if that?  Is that how you approach things?

"[Juror No. 4629]:  What?  Please rephrase.

"Ms. Locke-Noble:  Do you look at all of the possibilities?

"[Juror No. 4629]:  As many as possible.

"Ms. Locke-Noble:  Okay.  In this case there is a standard of proof, and the standard of proof is beyond a reasonable doubt; you can't look at all of the possibilities.  Can you follow that law?

"[Juror No. 4629]:  Oh, certainly, of course.

"Ms. Locke-Noble:  Because if you start looking at all of the possibilities, you then become an advocate or a partisan for one side of the other, you become the lawyer for one person or the other.  Does that make sense?

"[Juror No. 4629]:  This would be a violation of my civic duty to be impartial.  If you are an advocate and defense

counsel are advocates, I am not an advocate and I will never act as one.

"Ms. Locke-Noble: Right. And that's what I'm getting at. Because you're an engineer, and engineers are trained to look at all of the various possibilities, and in human affairs we cannot — I cannot prove all of the possibilities.

"[Juror No. 4629]: Oh, heavens. That's wrong about engineering too, for that matter. There are significant factors and there are things that are insignificant. The insignificant digits, you do not concern yourself with. That's putting it in language that you're — a proper answer."

This juror was ultimately dismissed by stipulation because he had discussed his questionnaire answers with another juror.

The prosecutor also questioned the final engineer in the panel, Prospective Juror No. 5128, a white male. As she did with Juror No. 4629, the prosecutor first asked Juror No. 5128 about the role that speculation played in his work and then pivoted to whether he could refrain from speculating in his role as a juror:

"Ms. Locke-Noble: Are you trained to say, what if this? What about that possibility?

"[Juror No. 5128]: Yes, very much so.

"Ms. Locke-Noble: You can't do that in this case.

"[Juror No. 5128]: That's right, I don't know — I'll accept that I can't do that.

"Ms. Locke-Noble: You cannot come up with a hypothesis and then prove it.

"[Juror No. 5128]:  I understand.  [¶] . . . [¶] . . .

"Ms. Locke-Noble:  And so for twenty years you have been on a daily basis going through this process, what if this? This could happen.  What if that?  This could happen, correct?

"[Juror No. 5128]:  That's right, my profession involves the design of systems that go on [airplanes], so it's a natural type of occurrence.

"Ms. Locke-Noble:  You are taught to look at all possibilities?

"[Juror No. 5128]:  Yes, definitely.  Well, I've learned to do that.  [¶] . . . [¶] . . .

"Ms. Locke-Noble:  As you know you can't go back and speculate.  You can only base your verdict on the testimony that is presented in this courtroom?

"[Juror No. 5128]:  Yes ma'am.  I understand that.

"Ms. Locke-Noble:  You can't do what if this, or what if that, because if you do that, you have now become the lawyer for either one of the sides.

"[Juror No. 5128]:  I understand.

"Ms. Locke-Noble:  Would you agree with that?

"[Juror No. 5128]:  I agree, yes."

After voir dire, the prosecutor attempted to strike this juror for cause for two reasons unrelated to his engineering background. Juror No. 5128 was ultimately dismissed by stipulation.

In sum, the record shows that before questioning E.W., the prosecutor did not question any of several engineers about their engineering training, even though she did question those jurors

about other topics. Only after she questioned E.W. did she question the remaining two engineers about their engineering training. In doing so, the prosecutor elicited from E.W., Juror No. 4629, and Juror No. 5128 answers that acknowledged the role of speculation in their work and training. But the prosecutor elicited only from Juror No. 4629 and Juror No. 5128, and not from E.W., answers that confirmed their ability as jurors to avoid looking at "all possibilities" and instead to stick to the evidence presented and apply the proper standard of proof. These disparities "at least raise[ ] a question as to how interested [the prosecutor] was in meaningfully examining whether" E.W.'s training as an engineer would impair his ability to apply the beyond a reasonable doubt standard. (*Gutierrez, supra,* 2 Cal.5th at p. 1170.) Today's opinion does not dispute the accuracy of the voir dire record quoted above; the court's only response is a bald assertion, with no analysis of the prosecutor's questioning, that the record does not "reveal[ ] any significant disparity." (Maj. opn., *ante,* at p. 61, fn. 18.)

I would add one more observation: In explaining this area of concern, the prosecutor said she was troubled not only by E.W.'s engineering training, but also by the fact that E.W. was "working on his master's in pneumatics," which she characterized as "also a study of looking for all possible doubts." This assertion at best "left some lucidity to be desired." (*Gutierrez, supra,* 2 Cal.5th at p. 1169.) Pneumatics, according to various dictionaries, is the study of the mechanical properties of air and other gases. It is hardly "an obvious or natural inference" (*ibid.*) to say that pneumatics is "a study of looking for all possible doubts." The trial court did not probe this statement, and the prosecutor's questioning of E.W. "failed to shed light on the nature of [her] apprehension or otherwise

indicate [her] interest in meaningfully examining the topic, and the matter was far from self-evident." (*Id.* at p. 1171.)

## III.

Let us now consider the prosecutor's concerns about E.W.'s views on LWOP and the death penalty. In its original ruling on the strike of E.W., the trial court determined that these concerns were genuine, race-neutral justifications, and today's opinion concludes that "[t]he record substantiates that E.W. held the views the prosecutor ascribed to him." (Maj. opn., *ante*, at p. 51.) But there are several problems here.

In explaining her concern that E.W. believed LWOP is a more severe sentence than death, the prosecutor said, "All the other jurors currently sitting in the box have indicated that death is the most severe punishment that can be given, with the exception of [the juror then seated in the fourth position], who has indicated both are equal." Later, the prosecutor said that "all peremptory challenges have been on that basis, if they said they believe in life without the possibility of parole is the most severe punishment then I have pre-empted them or challenged them for cause." Later still, the prosecutor said that "none of the other jurors up on that panel right now have indicated life without the possibility of parole is the most severe sentence, with the exception of one who has indicated it is both."

The trial court, in its ruling, did not make a reasoned attempt to evaluate the prosecutor's claim that she had sought to remove every juror who said LWOP is more severe than death. It merely said that "*if* Ms. Locke-Noble is consistently challenging by way of peremptory, folks who cannot impose the death penalty or feel that life without parole is the most severe sentence and that is not a race basis for excusing a juror."

15

(Italics added.) As it turns out, the prosecutor's claim was materially incomplete and potentially misleading.

The prosecutor was correct in her characterization of the seated jurors' answers to an item on the juror questionnaire asking whether death or LWOP is a "more severe punishment." But, as today's opinion acknowledges (maj. opn., *ante*, at p. 56), the prosecutor accepted no fewer than three seated jurors (Juror No. 4, Juror No. 5, and Juror No. 9) and one alternate (Alternate Juror No. 5) who, like E.W., had selected LWOP as opposed to death in response to a separate item on the questionnaire asking which punishment is "worse for a defendant." To be sure, the prosecutor did remove many jurors with views similar to E.W.'s. (*Id.* at pp. 54–55.) But not only did she accept four jurors who, like E.W., indicated that LWOP is a worse punishment than death; one of those jurors, Juror No. 5, had already been seated by the time the prosecutor made her assertion about the composition of the panel. The prosecutor's repeated and emphatic assertion that none of the seated jurors had identified LWOP as the most severe sentence was potentially misleading and presented a significant concern that the trial court, in its initial ruling and especially when it revisited the *Batson* issue in its new trial ruling, should have noticed and addressed.

The Attorney General contends that the seated jurors differed from E.W. insofar as they indicated that LWOP was worse than death on only one of two items on the questionnaire, whereas E.W. indicated that view on both items. The Attorney General also suggests it is significant that the seated jurors chose death as opposed to LWOP on the item asking "Which do you believe is a more severe punishment" because this question, he says, is designed to elicit a juror's objective rather than subjective views.

Today's opinion does not endorse the Attorney General's argument, and rightly so. The two items on the questionnaire are virtually indistinguishable (see maj. opn., *ante*, at p. 43, fn. 7), and the court does not suggest otherwise. The record shows that the prosecutor herself did not see a distinction between the two questions. In questioning Prospective Juror No. 9807, she engaged in the following exchange:

> "Ms. Locke-Noble: Question 198 says, 'If a defendant convicted of first degree murder, and one or more of the special circumstances is found true, the law provides for one of only two possible punishments, death or life in prison without the possibility of parole. Overall in considering the general issue of punishment, which do you think worse[,] death or life in prison without the possibility of parole.' Which do you believe?

> "[Juror No. 9807]: I think we have already answered that. For me, personally, I would have rather have death, but I don't know what is best for everybody else.

> "Ms. Locke-Noble: Would you personally want death?

> "[Juror No. 9807]: I couldn't stand to spend the rest of my life in jail.

> "Ms. Locke-Noble: So would you say that it is your belief that life without the possibility of parole is a more severe punishment because, personally, you believe that spending the rest of your life in jail would be worse?

> "[Juror No. 9807]: Yes, I think I would agree with that."

Moreover, on both items, E.W. made clear that his answer indicated his *subjective* view on the severity of LWOP compared to death; on one item, he wrote, "I would hate to be incarcerated

that long — useless," and on the other, he wrote, "To me, I'd rather die . . . ." His view is indistinguishable from the view of Juror No. 4, a white woman, who answered that she thought LWOP would be worse for a defendant because "I can only base this on my own personal choice. And I value freedom." Similarly, Juror No. 5, a white man, answered that he thought LWOP would be worse because "I don't know how [the] defendant feels, but myself."

Today's opinion attempts to distinguish these jurors from E.W. on the ground that E.W. used the word "useless" to describe the death penalty, whereas Juror No. 4, Juror No. 5, Juror No. 9, and Alternate Juror No. 5 each hedged their responses with some support for the death penalty in some circumstances. (Maj. opn., *ante*, at p. 56.) But E.W.'s views also had nuance. As E.W. explained: "I guess it's kind of like the question [i.e., whether he was ever for or against the death penalty] is asking like political views almost, because the answer that I gave was kind of like, 'Okay, well, I'm okay with it, but realizing also the social ramifications of what it does to the court system and the criminal system and whatnot, maybe we should find another way.' I'm thinking in the terms of the legislators. I'm not saying when I sit here that I can't apply the law."

During voir dire, the prosecutor questioned E.W. about his views at length. When questioned about his *objective* views, E.W. left no doubt that he — like the seated jurors — understood death, not LWOP, to be the more severe sentence under the law. The prosecutor asked E.W., "So my question to you, if you personally believe that in this case and it's a severe case, and you believe that it deserves the most severe punishment, would you be able to impose death instead of life without the possibility

18

of parole?" E.W. answered, "Yes." The prosecutor then gave E.W. a hypothetical scenario of a bank robbery involving three people: one who goes into the bank with a gun, one who waits outside the bank as a lookout, and one who waits in the car with the motor running. In the prosecutor's hypothetical, the three people agree to rob the bank; all three know that the first person has a gun and that the gun is loaded; and during the robbery, the person with the gun shoots and kills someone. The prosecutor then asked, "So in your mind would all three be equally guilty of the murder?" E.W. responded, "Yes." Next, the prosecutor asked, "Now . . . in your mind would you be able to impose the death penalty on the person waiting out in the car, if the aggravating circumstances substantially outweigh the mitigating circumstances?" E.W. responded, "I would say, based on the circumstances you gave me, I lean towards life on the person — the people outside." When the prosecutor asked E.W. to explain his answer, E.W. said that the people outside "did not have the opportunity to make the decision at the moment of the crime of murder, whether or not it would take place. [¶] . . . [T]hey are guilty for aiding someone in participating in the crime, but they are not as guilty." E.W. further explained, "Once again, because they created a situation where a murder could happen, they are all guilty of it, but as far as punishment, I don't believe that all three are equal and should be punished in the same way."

This exchange, in which E.W. said he would give LWOP to the hypothetical bank robbers who were "not as guilty," makes clear that E.W. was able to separate his subjective view about the severity of death from an objective understanding that death, not LWOP, is reserved for the most serious offenses. Today's opinion suggests that the only "significance" of this

exchange is that it shows E.W.'s views would not "substantially impair his ability to vote for execution." (Maj. opn., *ante*, at p. 52; see *ibid.* ["E.W. was not excused for cause."].) But the court ignores the key point: E.W.'s voir dire responses show that his views on the relative severity of death and LWOP were no different than how the prosecutor purportedly understood the views of Juror No. 4, Juror No. 5, Juror No. 9, and Alternate Juror No. 5. The LWOP concern, "while not explicitly contradicted by the record, [is] difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered [E.W.] an unattractive juror." (*Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1750].)

The trial court did not examine whether the record of voir dire supported the prosecutor's concern that E.W. believed LWOP is the more severe punishment. Although it is possible that the prosecutor was somehow left unconvinced by E.W.'s answers at voir dire, that is not apparent in the record. If the trial court had probed the discrepancy between the prosecutor's statements and the voir dire responses of E.W. and the seated jurors above, the prosecutor could have elaborated further on her concern. But as the record stands, we are left with a stated reason that is unsupported by the record of voir dire. "The court may have made a *sincere* attempt to assess the [prosecutor's] rationale," but in light of its failure to probe further, "we cannot find under these circumstances that the court made a *reasoned* attempt to determine whether the justification was a credible one." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1172.)

## IV.

As the discussion above shows, the main reasons credited by the trial court — the engineering concern and the LWOP

concern — present significant questions about the prosecutor's credibility. Let us now consider the rest of the prosecutor's stated reasons, which today's opinion dismisses with only cursory analysis. (Maj. opn., *ante*, at p. 61.) Those reasons have their own weaknesses and do not bolster the prosecutor's credibility when considered in combination with the others.

As to the prosecutor's concern that E.W. believed prosecutors are too zealous to convict, E.W. wrote in his juror questionnaire that he based this opinion on "T.V. shows — obviously I don't give this opinion much weight." E.W. identified a similar concern regarding defense attorneys (they "[t]end to manipulate [the] system to win") and said he based this opinion on "T.V. shows. Obviously I don't give this opinion much weight." The prosecutor did not question E.W. about this issue during voir dire, and the trial court briefly observed that "he is really talking about television shows" and does not "give this opinion much weight."

As to the prosecutor's concern that E.W. believed "the death penalty needs to be reformed just like affirmative action," E.W. made this statement during voir dire in response to the prosecutor asking him whether the death penalty should be abolished. E.W. answered, "No," and then explained that the death penalty needed reform, "just like affirmative action. . . . [¶] I'm not against it."

As to the prosecutor's concern that E.W. said he had been subject to questionable stops by Long Beach police officers, it gives me pause to credit a reason that is so widely applicable to African Americans and that may itself be the product of racial bias, whether conscious or unconscious. (See *Floyd v. City of New York* (S.D.N.Y. 2013) 959 F.Supp.2d 540, 572–589

[discussing expert analyses of 4.4 million police stops in New York City between 2004 and 2012, and finding that blacks and Hispanics are far more likely than whites to be stopped and frisked, and that police stops of blacks or Hispanics are substantially less likely than police stops of whites to uncover a weapon or contraband]; Pierson et al., A Large-scale Analysis of Racial Disparities in Police Stops Across the United States (2017) <https://5harad.com/papers/traffic-stops.pdf> [as of Feb. 4, 2019] [analyzing 60 million traffic stops in 20 states between 2011 and 2015, and finding that black drivers are stopped more often than white drivers after controlling for age, gender, location, and other variables, and that black and Hispanic drivers are searched on the basis of less evidence than white drivers]; all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.)

As to the prosecutor's assertion that E.W. was "neither for nor against" the death penalty, the record indicates that E.W. was "for" the death penalty according to how the prosecutor defined the term. During voir dire, the prosecutor explained to E.W. that "when I say 'for it' not that you are out there protesting for it, something like that, but you are not against it." In response, E.W. clarified, "Right, I'm not against it." The prosecutor then asked, "You don't believe that California should abolish it?" E.W. answered, "No."

That leaves the prosecutor's concern that E.W. identified "bad police officers, and lawyers and . . . bias[ ] against economically disadvantaged defendants" as "the three most important problems with the criminal justice system," as well as her concern that E.W. seemed to know more about the law than other jurors. Although these concerns are not inherently

22

implausible, they are somewhat underwhelming, and the prosecutor did not question E.W. about them. The trial court did not find, nor does this court suggest, that these reasons weigh significantly in favor of the prosecutor's credibility.

## V.

In light of the problematic record in this case, it is worth underscoring some guidance we recently provided: "Though we exercise great restraint in reviewing a prosecutor's explanations and typically afford deference to a trial court's *Batson*/*Wheeler* rulings, we can only perform a meaningful review when the record contains evidence of solid value. Providing an adequate record may prove onerous, particularly when jury selection extends over several days and involves a significant number of potential jurors. It can be difficult to keep all the panelists and their responses straight. Nevertheless, the obligation to avoid discrimination in jury selection is a pivotal one. It is the duty of courts and counsel to ensure the record is both accurate and adequately developed." (*Gutierrez, supra*, 2 Cal.5th at p. 1172.)

The record here contains a number of proffered explanations for the strike of a black juror that are implausible, misleading, contradicted by the record, or difficult to credit in light of the prosecutor's disparate treatment of similarly situated jurors. The trial court should have pressed the prosecutor on these points, but it did not. As in *Gutierrez*, we are left with anomalies and inconsistencies that are simply too numerous and significant to permit a conclusion that the trial court's ruling rests on a reasoned effort to evaluate the prosecutor's reasons in light of all relevant circumstances. (*Gutierrez, supra*, 2 Cal.5th at p. 1175.) "Rarely does a record contain direct evidence of purposeful discrimination. More

often, . . . the inquiry calls on courts to assess the credibility of reasons given for a strike by drawing inferences from ' "such circumstantial . . . evidence of intent as may be available," ' including comparative juror analysis." (*Id.* at p. 1182 (conc. opn. of Liu, J.), quoting *Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1748].)  On this record, I cannot say with certainty that the prosecutor's strike of E.W. was improper; had the trial court probed further, the prosecutor might have clarified the discrepancies.  But we must take the record as it comes to us, and certainty is not the standard.  In this case, the record leads me to conclude that the trial court's denial of Armstrong's claim that "it was more likely than not that the challenge was improperly motivated" (*Johnson v. California, supra,* 545 U.S. at p. 170) was unreasonable.  I respectfully dissent.

**LIU, J.**


**We Concur:**

**CUÉLLAR, J.**
**PERLUSS, J.**[*]


---

[*]     Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Armstrong

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S126560
**Date Filed:** February 4, 2019

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Tomson T. Ong

_____

**Counsel:**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Lance E. Winters, Assistant Attorney General, Keith H. Borjon, Joseph P. Lee and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen Niemy
257 Washington Street, Unit 6
Salem, MA  01970
(207) 699-9713

Yun K. Lee
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6078